305 Ga. 701
FINAL COPY

S19A0158. OUTLER v. THE STATE.

BLACKWELL, Justice.

Clifton Leandre Outler was tried by a Jefferson County jury and convicted of murder, aggravated assault, armed robbery, and three counts of possession of a firearm during the commission of a felony, all in connection with the fatal shooting of Anthony Holmes. Outler appeals, contending that the State failed to present evidence legally sufficient to sustain his convictions, that the trial court erred when it allowed a prosecuting attorney to question a witness in the presence of the jury after the witness invoked his constitutional privilege against self-incrimination, and that he was denied the effective assistance of counsel. Upon our review of the record and the briefs, we find no merit in these claims of error, but we note that the aggravated assault should have merged with the murder and that Outler should have been convicted on only one count of possession of a firearm during the commission of a felony. Accordingly, we

vacate the convictions for aggravated assault and two counts of possession of a firearm during the commission of a felony, and we otherwise affirm.[1]

1. Viewed in the light most favorable to the verdict, the evidence shows that Outler moved into Holmes's house in Dublin around the end of April 2011. Outler was from Wadley (a city south of Louisville in Jefferson County), and he was the only connection that Holmes had to Wadley. Holmes told members of his family that he and Outler were lovers, and — during their brief relationship —

---

[1] Holmes was killed in May 2011. A grand jury indicted Outler and Jeremy Reid in February 2013, charging both with murder, armed robbery, two counts of aggravated assault, and three counts of possession of a firearm during the commission of a felony. Outler alone was tried in May 2013, and the jury found him guilty on all counts. The trial court sentenced Outler to imprisonment for life without the possibility of parole for murder, a consecutive term of imprisonment for twenty years for armed robbery, a concurrent term of imprisonment for twenty years for aggravated assault, and concurrent terms of imprisonment for five years for each of the three counts of unlawful possession of a firearm during the commission of a felony. The trial court merged the other aggravated assault with the murder. Outler filed untimely motions for new trial in November 2015 and July 2016. He then filed a motion for an out-of-time appeal in March 2018, which the trial court granted in April 2018. Outler filed another motion for new trial in May 2018, and the trial court denied that motion in July 2018. Outler filed a timely notice of appeal, and his case was docketed in this Court for the term beginning in December 2018 and submitted for decision on the briefs.

Holmes bought clothing for Outler and sometimes allowed Outler to borrow his cell phone and drive his car.

On May 16, 2011, Holmes's decomposing body was found near a creek behind an unoccupied log cabin in Wadley. He had been shot in the head and repeatedly beaten with a blunt instrument. The medical examiner testified that Holmes could have survived the gunshot wound if he had received treatment but that a depression fracture to his skull, which was caused by the beating, would have been "devastating" and fatal.

Holmes had last been seen on the morning of May 11 in Dublin, and it appears that his and Outler's relationship had soured in the days preceding his disappearance. On May 9 and 10, Holmes had been looking at apartments in Macon so that he could leave Dublin (and Outler), and he had around $6,000 in cash that he planned to deposit in a new checking account. Meanwhile, Outler was apparently borrowing Holmes's car without permission, and on May 9, Outler provided his cousin Jeremy Reid with a check on Holmes's (old) checking account and asked Reid to cash it for him (although

Reid testified that he refused to do so). And Outler made several inquiries with acquaintances in Wadley about where he could obtain a gun. On the evening of May 10, a Dublin police officer conducted a traffic stop of Holmes's vehicle as it pulled into Holmes's driveway. Outler was the sole occupant, and — after Outler exited the car — the officer observed that Outler had a RG-22 revolver in his pocket. Holmes came outside and told the officer that Outler was only supposed to be washing the car that day, not driving it. But Outler had run off behind the house, and the officer did not pursue him.

While Holmes's activities after his May 10 conversation with the police officer are largely unknown, Outler was seen in numerous locations throughout Wadley on May 11. That afternoon, Outler and his brother Antoine Brown were picked up by Brown's girlfriend, who was accompanied by her niece and her niece's daughter. Outler directed the girlfriend to drive to the cabin by the creek where Holmes's body was later found. Outler went behind the cabin for around ten minutes before returning (without explanation) to the girlfriend's SUV. The girlfriend then drove Outler and Brown from

Wadley to Swainsboro to do some shopping. On the way there, Outler and Brown were both "flashing" large amounts of cash, and Brown later told his girlfriend that he had $6,000.

On May 18, police officers conducted a search of the home of Outler and Brown's mother, and they found clothes that had been soaked in bleach, two empty bottles of bleach, and several .22-caliber bullets in a drawer. Soon thereafter, Brown told police that Outler had asked for his help to "hit a lick" and later said that he had committed a robbery and had to "off" someone. Phone records established that Holmes's phone was taken to Wadley on the morning of May 11 and to Swainsboro that afternoon, with numerous calls made from that phone to Outler's friends and family, including 19 calls to Brown.

(a) Outler complains that the evidence presented at trial is insufficient to sustain his convictions because it was only circumstantial but failed to exclude every reasonable hypothesis other than his guilt. See OCGA § 24-14-6 ("[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be

consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused"). But not every hypothesis is a reasonable one, and the evidence "need not exclude every *conceivable* inference or hypothesis — only those that are reasonable." Merritt v. State, 285 Ga. 778, 779 (1) (683 SE2d 855) (2009) (emphasis in original). Whether an alternative hypothesis raised by the defendant is "reasonable" is a question committed principally to the jury, "and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law." Carter v. State, 276 Ga. 322, 323 (577 SE2d 787) (2003).

At trial, Outler argued that it was Brown who killed Holmes. But there was no evidence that Brown ever met Holmes or had even been to Dublin (where Holmes lived). And Holmes's only connection to Wadley (where his body was found), was Outler, not Brown. In addition, within two weeks of moving in with Holmes, Outler asked

at least two people about getting a firearm, was seen by a police officer with a firearm just before Holmes was killed, and was using Holmes's car without permission and attempting to access funds in Holmes's checking account. And it was Outler (not Brown) who directed Brown's girlfriend to drive him to the murder scene, where his activities behind the cabin were never explained (except by Brown, who said that Outler told him that he had been having sex with a "lady" in the cabin and thought he had left something there). The jury was authorized to reject Outler's hypothesis that Brown killed Holmes (especially without Outler's participation). And the evidence was sufficient to authorize the jury to find Outler guilty of the crimes for which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

(b) Although the jury was authorized by the evidence to find Outler guilty of an aggravated assault upon Holmes with a firearm, the trial court erred when it failed to merge this aggravated assault with the murder. Merger generally is required when there is no deliberate interval between the non-fatal injury that forms the basis

for aggravated assault (here, the shooting) and the fatal injury that forms the basis for the murder (here, the beating). See <u>Alvelo v. State</u>, 290 Ga. 609, 611-612 (2) (724 SE2d 377) (2012). In this case, there was no evidence at all of a deliberate interval between the shooting and the beating. Accordingly, the conviction and sentence for aggravated assault with a firearm must be vacated. See <u>Battle v. State</u>, 305 Ga. 268, 272 (1) (c) (824 SE2d 335) (2019).

We also conclude that the trial court erred when it convicted and sentenced Outler on three counts of possession of a firearm during the commission of a felony. The indictment charged Outler with unlawfully possessing a firearm during the commission of the murder, armed robbery, and aggravated assault. But

> where multiple crimes are committed together during the course of one continuous crime spree, a defendant may be convicted once for possession of a firearm during the commission of a crime as to every individual victim of the crime spree, as provided under OCGA § 16-11-106 (b) (1), and additionally once for

firearm possession for every crime enumerated in [paragraphs] (b) (2) through (5).

State v. Marlowe, 277 Ga. 383, 386 (2) (c) (589 SE2d 69) (2003). Here, the murder, armed robbery, and aggravated assault were all part of one continuous crime spree involving a single victim, and Outler was not convicted of any crimes enumerated in paragraphs (b) (2)-(5) of OCGA § 16-11-106. As a result, OCGA § 16-11-106 (b) authorizes only one conviction and sentence for possession of a firearm during the commission of a felony in this case, and we vacate Outler's convictions and sentences for the unlawful possession of a firearm during the commission of armed robbery and aggravated assault.

2. Outler claims that his rights under the Confrontation Clause were violated when the prosecuting attorney continued questioning Reid about a statement that Reid had given to an investigator even after Reid invoked his privilege against self-incrimination under the Fifth Amendment. Outler asserts that this continued questioning essentially allowed the prosecuting attorney to testify for Reid about

matters on which he could not be cross-examined. See <u>Lingerfelt v. State</u>, 235 Ga. 139, 139-140 (218 SE2d 752) (1975) (finding trial court erred when it allowed the State "to ask leading questions" about a pre-trial statement of a co-indictee who had invoked his right to silence at trial, which allowed the State to present "the content of the previous [statement] . . . without the benefit of cross[-]examination by the appellant"). See also <u>McIntyre v. State</u>, 266 Ga. 7, 11 (5) (463 SE2d 476) (1995) ("[w]hat is harmful is for the trial court to allow the State, once a witness has invoked his Fifth Amendment rights, in effect, to testify for the witness and circumvent meaningful cross-examination as to obvious inferences" (citation and punctuation omitted)).

In this case, however, the prosecuting attorney did not ask leading questions of Reid that allowed the State effectively to present the content of Reid's prior statement. Reid first invoked his privilege against self-incrimination when the prosecuting attorney asked Reid if he had lied when he told the investigator that he had seen Outler with Holmes on the morning of May 11. But by that

point, Reid had already testified that he had made the statement in question to the investigator, and he also had already testified that (notwithstanding his statement) he had not, in fact, seen the two men that morning. The substance of his testimony on these points was not revealed for the first time by the question that immediately preceded his invocation of the privilege. And the only other questions about the statement that Reid subsequently refused to answer were whether he had told the investigator if he saw who killed Holmes and whether he told the investigator anything else. Neither of those were leading questions with "obvious inferences" that allowed the State to present the content of Reid's statement to the investigator. As a result Outler's rights under the Confrontation Clause were not violated, and this claim has no merit.

3. Finally, Outler alleges that his trial counsel was ineffective when he failed to object to the redirect-examination of a witness about a "rumor" that the prosecuting attorney claimed to have heard. To prevail on a claim of ineffective assistance, Outler must prove both that the performance of his lawyer was deficient and that

he was prejudiced by this deficient performance. See <u>Strickland v. Washington</u>, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that the performance of his lawyer was deficient, Outler must show that the lawyer performed her duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. Id. at 687-688 (III) (A). See also <u>Kimmelman v. Morrison</u>, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). And to prove that he was prejudiced by the performance of his lawyer, Outler must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U. S. at 694 (III) (B). This burden is a heavy one, see <u>Kimmelman</u>, 477 U. S. at 382 (II) (C), and we conclude that Outler has failed to carry it.

Here, after the witness at issue testified that Outler came to his house in Wadley on May 11, the prosecuting attorney said that there "was a rumor, and this is a rumor, . . . that Mr. Outler had

brought the gun to you that day . . . and asked you to take it to Atlanta to get rid of it." The prosecuting attorney then asked the witness if the rumor was true, and the witness said that it was not. Outler now contends that his trial lawyer should have objected to the question about the rumor. But the lawyer testified at the hearing on Outler's motion for new trial that she did not object because she knew that the witness would say that the rumor was untrue, and she thought it was in Outler's interest for the State to solicit testimony about the fallacy of the rumor. Indeed, in her closing, Outler's lawyer was able to argue that the "rumor" cited by the State did not make any sense: "it costs too much in gas to drive all the way to Atlanta to get rid of a cheap old gun." And the prosecuting attorney acknowledged in his closing that he "suspect[ed] that [Outler's lawyer]'s right, that you wouldn't drive to Atlanta to get rid of a gun. That would seem foolish." Outler has not shown that his lawyer's strategy was unreasonable, and he has failed to establish ineffective assistance in this regard.

<u>Judgment affirmed in part and vacated in part. All the Justices concur</u>.

Decided April 29, 2019.

Murder. Jefferson Superior Court. Before Judge Palmer.

<u>David J. Walker</u>, for appellant.

<u>S. Hayward Altman, District Attorney, Kelly A. Jenkins, Tony A. May, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General</u>, for appellee.