307 Ga. 644
FINAL COPY

S19A1298.  DRIVER v. THE STATE.

WARREN, Justice.

Frederick Duane Driver was convicted of felony murder and possession of a firearm during the commission of a felony in connection with the shooting death of Randy Diamond.[1]  On appeal, Driver contends only that the trial court erred in admitting into evidence an admission he made to police while in custody.  We disagree and affirm.

1.  Viewed in the light most favorable to the jury's verdicts, the

---

[1] The crimes were committed on June 17, 2017.  On August 25, 2017, a Floyd County grand jury indicted Driver for malice murder, one count of felony murder predicated on both aggravated assault and aggravated battery, two counts of aggravated assault, aggravated battery, and possession of a firearm during the commission of a felony.  At a trial held from June 11 to 13, 2018, a jury found Driver not guilty of malice murder but guilty of all remaining counts.  On June 13, 2018, the trial court sentenced Driver to life in prison for felony murder and a consecutive term of five years for the firearm offense.  The remaining counts were merged into the felony murder conviction.  Driver filed a timely motion for new trial on June 18, 2018, which was later amended through new counsel on December 11, 2018.  The amended motion was denied on March 7, 2019, and Driver filed a timely notice of appeal on March 22, 2019.  The case was docketed in this Court for the August 2019 term and submitted for a decision on the briefs.

evidence presented at Driver's trial showed that on the evening of June 17, 2017, Driver attended a party at Diamond's home on East Main Street in Rome. Diamond and Driver were not close friends, but Driver occasionally visited Diamond's house. Soon after Driver's arrival, he and Diamond got into an argument over money that Driver allegedly owed Diamond. At that time, nobody at the party possessed a weapon. Driver "got smart" with Diamond and, in response, Diamond punched Driver one time. Diamond then demanded that Driver leave, and Driver left the house. About 15 minutes later, Driver returned to the driveway of Diamond's house. Driver still did not have a weapon. He was told to leave, and he again left.

Seven or eight minutes later, Driver — who was at that point armed with a gun — returned a third time and approached Diamond's house. Diamond's brother was standing in the doorway of the home and, upon seeing Driver, yelled into the house "he's got a gun." Diamond, who had been seated on his couch, got up and walked to the door. He did not display any weapon, threaten or

2

argue with Driver, or become violent. Driver fired four shots, hitting Diamond twice in the chest. Diamond died shortly after paramedics arrived. All three witnesses present at the time identified Driver as the shooter.

Jerry Chisolm, a neighbor of Diamond's, testified that before the shooting, earlier on the same evening, Driver told him that he had been in an altercation and had a "swelled eye." After the shooting, Driver told Chisolm that he had killed someone by shooting him in the chest. Chisolm testified that Driver looked as if he had been in "another altercation" apart from the one resulting in Driver's swollen eye because "he was bleeding on the other side." Chisolm further explained that Driver's "eye was still swelled up like it was swollen more. But his lip was busted." After hearing police sirens, Driver told Chisolm he had to go and left.

That night, police obtained a warrant for Driver's arrest. Driver turned himself in to the police three days later, telling a 911 operator that the police had warrants for his arrest because he had "shot somebody." And in a body camera recording from the officer

3

dispatched to arrest Driver, Driver introduced himself to the officer as the person who "shot the guy on East Main." Later, during an interview after Driver's arrest, he told Investigator Pete Sailors that Diamond "just told me to get the f**k out of his house, and . . . he punched me. So then I shot him." Driver also said that they were at Diamond's house and "it was like he was coming out the door to come at me, . . . and he's a big guy. . . . It was like he was bullying me, . . . and . . . it just happened."

Driver does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Driver guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Driver's sole enumeration is that the trial court erred in

admitting an incriminating statement he made to police while in custody after invoking his right to counsel.[2]  After reviewing the record, we see no error in the trial court's ruling and affirm.

(a) "It is well established that a suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made available or until the suspect reinitiates the conversation." *Dozier v. State*, 306 Ga. 29, 35 (829 SE2d 131) (2019) (citation and punctuation omitted).  See also *Edwards v. Arizona*, 451 U. S. 477, 484-486 (101 SCt 1880, 68 LE2d 378) (1981).  And in the absence of either the suspect's reinitiation of the conversation or the presence of his counsel, "police must immediately cease interrogation, or its functional equivalent, including any words or actions by law enforcement calculated to elicit an incriminating response." *Taylor v. State*, 303 Ga. 225, 231 (811 SE2d 286) (2018).  "In determining

---

[2] In his appellate brief, Driver makes the fleeting assertion that the trial court erroneously decided that his custodial statement was "freely and voluntarily made."  But neither Driver's motion to suppress nor his appellate brief makes any argument that his statement was not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment.

5

whether the actions of law enforcement constitute an interrogation, courts look primarily to the perceptions of the suspect and not the intent of the officer." Id. (citation and punctuation omitted). Even where the accused reinitiates the conversation, it must be determined, under the totality of the circumstances, whether he "freely and voluntarily waive[d] [his] right to counsel." Id. See also *Rowland v. State*, 306 Ga. 59, 62 (829 SE2d 81) (2019). Moreover, "where the issue is . . . a suspect's purported initiation of renewed contact, rather than the propriety of interrogation clearly instigated by police," case law applying the definition of "initiation" applies whether the suspect invoked his right to counsel or his right to silence. *Mack v. State*, 296 Ga. 239, 245-246 n.5 (765 SE2d 896) (2014) (discussing applicability of *Edwards*, 451 U. S. at 481-487, and its progeny in evaluating a defendant's "post-invocation 'initiation' of contact with police"). As an initial matter, "'initiation' requires not only that the defendant speak up first but also that his words reflect a desire to discuss the investigation at hand," and a suspect has "'initiated' renewed contact with law enforcement

6

authorities, so as to permit further interrogation, only if the renewed contact by the suspect was not the product of past police interrogation conducted in violation of the suspect's previously-invoked rights." *Mack*, 296 Ga. at 246, 248. "[W]e review de novo the trial court's determinations of both fact and law" where, as here, the police interview in question was recorded with both video and audio, the recording is part of the record on appeal, and the parties point to no evidence beyond that interview to support their arguments regarding the admissibility of a confession or admission. *Dozier*, 306 Ga. at 33 (citation and punctuation omitted).

The recordings in this case show the following: after Driver was arrested and transported to the police station, a patrol officer took Driver into an interview room, moved Driver's handcuffs from behind his body to the front of his body, and then left Driver and Investigator Sailors together in the interview room. At the beginning of the interview, Investigator Sailors told Driver to call him "Pete" and asked Driver for a number of basic details: his name, address, date of birth, Social Security number, phone number,

7

education, and current employment. Investigator Sailors explained that he wanted to talk about what happened between Driver and Diamond, but that Sailors had to inform Driver about his rights first. Driver asked if he had to talk, and Investigator Sailors answered "No." Investigator Sailors read Driver his rights under *Miranda*[3] from the waiver-of-rights form and told Driver, "you don't have to talk to me today. It doesn't, you know, it's not going to get any worse if you don't, and nothing bad is going to happen to you." Investigator Sailors also told Driver that, "bearing that in mind, I want to talk to you about what happened so I can hear your side of the story, OK, because I've heard some of the witnesses down there and some people that you talked to after it happened." After referring to his experience as an investigator, Sailors said, "there's always two sides to everything, and I want to hear it straight from you about what happened. But, you don't have to tell me, and I can't make you; it's your choice." Investigator Sailors then asked,

---

[3] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

"bearing that in mind, would you like to tell me what happened between you and Mr. Diamond?" Driver responded, "Really, my brother's getting me a lawyer so, I really don't want to say nothing until I have my lawyer." Investigator Sailors responded, "OK, that's fine. That's your right. You've got my card," and "once you've talked to your attorney and y'all want to talk and tell us what happened from your point of view, we'll be glad to listen."

As Investigator Sailors gathered his paperwork to leave, Driver then said, "Speaking of something, Pete," and asked the investigator if he had personally talked to witnesses. Investigator Sailors said "yes, sir," and Driver asked if Sailors thought "it could be self-defense." Investigator Sailors responded, "Not from what I've heard, but, you know, without hearing it from your side . . . ." Driver inquired whether Sailors was obligated to tell him what he heard. Investigator Sailors answered "No," but he could say that Driver was "identified as the person who shot Mr. Diamond." Driver nodded his head and then said that Diamond "just told me to get the f**k out of his house, and . . . he punched me. So then I shot him." Investigator

9

Sailors responded by asking Driver where he was when he shot Diamond. Driver answered that they were at Diamond's house and "it was like he was coming out the door to come at me, . . . and he's a big guy. . . . It was like he was bullying me, he bullied me . . . and . . . it just happened." Investigator Sailors asked whether Driver wanted to talk some more about it or wait for his lawyer, and Driver responded, "I want to wait on my lawyer. I just wanted you to know that." Investigator Sailors then said "OK," asked Driver to let him know if he changed his mind, and left the room.

(b) Driver makes a number of arguments to support his contention that, under the totality of the circumstances, Investigator Sailors improperly interrogated Driver at various points during the interview, that Driver did not freely and voluntarily waive his right to counsel, and that Driver's custodial admission therefore should have been suppressed at trial. We address each argument in turn.

First, Driver argues that Investigator Sailors's initial questions, prior to giving Driver the *Miranda* warnings, amounted

10

to a "psychological ploy" to "build a rapport with [him] and make him feel more at ease . . . likely lead[ing] to an incriminating response," and that those initial questions therefore amounted to a custodial interrogation before administration of the required *Miranda* warnings. But we disagree, because "[t]he controlling case law excludes from the 'functional equivalent' of interrogation those police statements and actions normally attendant to arrest and custody." *Thompson v. State*, 295 Ga. 96, 103 (757 SE2d 846) (2014) (citation and punctuation omitted). "Basic biographical questions asked in relation to an arrest are an exception to *Miranda* because such 'booking' questions are unrelated to the investigation and serve a legitimate administrative need and therefore do not qualify as 'interrogation.'" *Kirby v. State*, 304 Ga. 472, 476 (819 SE2d 468) (2018). Thus, we "'have allowed questions seeking basic biographical data, such as the suspect's name, age, address, educational background, marital status, and other information required to complete an arrest form,'" either before or after a defendant has invoked his right to counsel. Id. (citation omitted).

11

Here, Investigator Sailors's initial background and biographical questions and conversation with Driver "about non-case-related matters did not constitute 'express questioning [about the crimes] by law enforcement officers or its functional equivalent,' and thus was not an improper interrogation." *Gray v. State*, 304 Ga. 799, 804 (822 SE2d 249) (2018) (citation omitted) (non-case-related matters in conversation between the accused and a detective included the accused's dog and where the accused was currently living). Moreover, there is no evidence to suggest that, for example, Investigator Sailors telling Driver he could call Sailors by his first name amounted to an impermissible "psychological ploy" that Sailors should have realized would result in an incriminating response. See *Kirby*, 304 Ga. at 476; *Thompson*, 295 Ga. at 103.

Second, Driver argues that after advising him of his rights under *Miranda* (but before he invoked his right to counsel), Investigator Sailors further interrogated Driver in a "cajoling" manner by expressing a desire to hear Driver's "side of the story." But the record shows that Investigator Sailors's comment was

12

merely part of his explanation that Driver did not "have to talk," that it was "not going to get any worse" if he did not, and that it was "[his] choice" whether to talk or not. These comments did not amount to an attempt to pressure or coerce Driver. Nor did Investigator Sailors suggest that Driver's defense would be somehow harmed if Driver decided to invoke his right to counsel. When Driver in fact invoked his right to counsel, Investigator Sailors again confirmed that right, expressed his willingness to honor Driver's decision, and made no further attempt to talk about the case in the absence of Driver's attorney. See *Kirby*, 304 Ga. at 476 ("When [the accused] clearly invoked his right to counsel, [the officer] had an obligation to stop interrogating [him] about [the] murder, and the [officer] complied with that duty."). Cf. *Anderson v. State*, 228 Ga. App. 617, 617-619 (492 SE2d 252) (1997) (holding that *after* the defendant invoked his right to counsel, an officer improperly interrogated him by saying that he wanted the defendant's "side of the story" and "perspective" on the events and that he might want to "go ahead and tell" anything that would help

13

the investigation) (punctuation omitted).

Third, Driver argues that Investigator Sailors continued his interrogation even after Driver invoked his right to counsel (but before Driver inquired about the investigation) by stating that he would be glad to listen to Driver and his attorney tell what happened from Driver's "point of view." Viewed in context, however, this statement does not rise to the level of interrogation because there is no evidence to suggest that the statement was designed to elicit an incriminating response or that Sailors should have known it was reasonably likely to do so. See *State v. Brown*, 287 Ga. 473, 478 (697 SE2d 192) (2010) (conversation between the defendant and detectives was not reasonably likely to elicit an incriminating response when, in context, the conversation related to future discussions that they could have about the case after the defendant had a lawyer).

Finally, Driver argues that after he invoked his right to counsel, but just before his admission that he shot Diamond, Investigator Sailors's disclosure of incriminating evidence to Driver,

14

followed by Sailors's silence in apparently waiting for Driver's response, amounted to continued interrogation. However, Investigator Sailors's responses did not violate Driver's previously invoked right to counsel under *Edwards* here because Driver's questions initiated a renewed conversation and "evinced a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-1046 (103 SCt 2830, 77 LE2d 405) (1983). See also *Gray*, 304 Ga. at 804-805. Driver relies on the holding of *Gardner v. State*, 261 Ga. App. 10, 11 (582 SE2d 7) (2003), to argue that disclosure of incriminating evidence can constitute improper custodial interrogation, but the defendant in that case, unlike Driver, had not been advised of his rights under *Miranda*, let alone waived his right to silence or his right to counsel either by reinitiating contact with law enforcement after invoking one of those rights or by some other means. Driver, by contrast, was advised of his *Miranda* rights, invoked his right to counsel, and then reinitiated discussion of his case. Under these circumstances, Investigator Sailors was "not obliged . . . to stop

15

listening to what [Driver] chose to say or to immediately leave the room so that [Sailors] could not hear him." *Kirby*, 304 Ga. at 476 (citation and punctuation omitted). See also *Taylor*, 303 Ga. at 231 (after the accused had invoked her right to counsel, an officer whose actions were not calculated to elicit an incriminating response and who did not ask, encourage, or engage the accused to talk about the victim's death "followed [the officer's] duty not to question, but had no duty not to listen"). Moreover, "[a] police officer's response to a direct inquiry by the defendant does not constitute 'interrogation.'" *Brown*, 287 Ga. at 477 (citation and punctuation omitted). Thus, "[a]n accused's response to an officer's answer to a question posed by the accused is not the product of custodial interrogation." *Gray*, 304 Ga. at 805 (citation and punctuation omitted). In sum, Investigator Sailors's response to questions Driver initiated and posed to Sailors when Sailors was preparing to walk out of the room did not render Driver's unsolicited and incriminating admission the product of interrogation that must be suppressed at trial. See *Rigsby v. State*, 306 Ga. 38, 41 (829 SE2d 93) (2019) (affirming trial court's

16

admitting into evidence an incriminating statement the defendant spontaneously and voluntarily made after previously invoking his right to counsel, where the defendant reinitiated a discussion about his charges and an investigator "merely tried to respond"). Considering the totality of the circumstances as reviewed above, we conclude that Driver voluntarily waived his right to counsel when he reinitiated the conversation with Investigator Sailors and made an incriminating admission.  See *Rowland*, 306 Ga. at 61-64. Accordingly, the trial court did not err in deciding not to suppress Driver's statements to Investigator Sailors.

*Judgment affirmed.  All the Justices concur.*

DECIDED JANUARY 13, 2020.
Murder. Floyd Superior Court. Before Judge Colston.
*Jerry W. Chappell II*, for appellant.

17

*Leigh E. Patterson, District Attorney, Luke A. Martin, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.