309 Ga. 772
FINAL COPY

S20A0910.  RUSSELL v. THE STATE.

McMILLIAN, Justice.

Michael Keith Russell was convicted of malice murder and other crimes in connection with the death of his girlfriend, Christy Waller.[1] Russell asserts four enumerations of error: (1) that the trial court erred in denying his motion to suppress his statements to police; (2) that the trial court erred in failing to properly instruct the

---

[1] Waller was killed on March 3, 2017. Russell was indicted by a Cherokee County grand jury on June 12, 2017, on one count each of malice murder; felony murder; aggravated battery, family violence; false imprisonment; and a violation of the Georgia Controlled Substances Act, as well as two counts of aggravated assault, family violence. Russell was tried from October 22 through October 26, 2018, and the jury found him guilty of all charges. The trial court sentenced Russell to life without parole for malice murder, with concurrent sentences of twenty years to serve on one of the aggravated assault counts, twenty years to serve on the aggravated battery count, ten years to serve for false imprisonment, and three years to serve for the violation of the Georgia Controlled Substances Act. The count of felony murder was vacated as a matter of law, and the other count of aggravated assault merged with the count of malice murder. We identify two sentencing errors, which are corrected in Division 4.
　　Russell filed a motion for new trial on November 1, 2018, and amended the motion on August 22, 2019. The trial court denied the motion for new trial on September 12, 2019, and Russell filed a notice of appeal to this Court the next day. The case was docketed to the April 2020 term of this Court and thereafter submitted for a decision on the briefs.

jury in its preliminary jury charge; (3) that Russell received constitutionally ineffective assistance of trial counsel when his counsel failed to object to that charge; and (4) that the trial court erred in failing to merge his remaining aggravated assault conviction under Count 4 into his conviction for malice murder. Russell also notes that his sentence contains a scrivener's error, sentencing him under Count 5 for aggravated *assault*, when he was actually charged with aggravated *battery*. Although we agree that the trial court committed sentencing errors and accordingly vacate Russell's sentence under Count 4 and remand for correction of the scrivener's error in Count 5, we otherwise affirm.

1. Viewed in the light most favorable to the verdict, the evidence presented at trial shows that in 2016, Russell moved with Waller and Waller's 11-year-old son, B. W., to an apartment in Woodstock, where B. W. was home-schooled. Waller's 17-year-old daughter, P. W., lived with friends so she could keep attending the same high school. On March 3, 2017, the day of the murder, B. W. slept late, and around midday, Russell, looking like he "had taken a

lot of drugs" and "had pulled his hair out," came into B. W.'s room to let B. W. know that he was leaving the apartment. Russell told B. W. that Waller was "going to be gone."

After B. W. heard Russell leave, he decided to stay in his room, and because B. W. felt "uncomfortable," he sent P. W. a series of three to four Snapchat messages asking her to come pick him up. P. W. agreed to come get him after school. When P. W. arrived with two friends at around 4:15 p.m., they discovered the apartment in disarray, with furniture overturned, broken electronics scattered, and the water in the kitchen sink running and overflowing onto the floor. They found B. W. playing a video game in his room with headphones on, and upon further investigation, they discovered Waller's body wrapped in a comforter in her bedroom. P. W. called 911, and the four young people left the apartment.

Law enforcement officers from the Woodstock Police Department and the GBI arrived shortly thereafter to begin their joint investigation. Around 10:30 p.m., while the investigators were awaiting a warrant to search the apartment, Russell arrived on the

scene driving Waller's car. He was immediately arrested. At the time of his arrest, Russell spontaneously apologized and asked if Waller and B. W. were okay. Russell also said he had come back to the apartment to commit suicide, but that God must not have wanted him to kill himself because the police were on the scene.[2]

After receiving a *Miranda*[3] warning, Russell indicated that he understood his rights and wanted to talk. Russell was interviewed in a GBI vehicle on the scene by Sergeant Preston Hall, a Woodstock Police detective, and GBI Special Agent Amanda Duttry (the "first interview"). During that interview, Russell admitted that he grabbed Waller by the throat with both hands, threw her to their bed, and held her there by the throat with his left hand for a short while. He also admitted hitting her three times, but he denied killing her. Russell said that Waller was coherent after he hit her, but she then put something in her mouth that made her unresponsive. Russell said Waller was breathing, however, when he left the

---

[2] This evidence was presented through witness testimony and was not on any recording introduced into evidence.

[3] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

apartment. Two hours into the interview, Russell invoked his right to counsel, and the detectives stopped the interview. An audio recording of that interview was played for the jury at trial ("Statement 1").

A short time later, while Russell was awaiting transport from the scene under the supervision of GBI Assistant Special Agent in Charge Michael Walsingham, Russell spontaneously said that he wanted to speak to the interviewing officers again to correct what he had told them earlier. He wanted to tell them that he had done it "on purpose. . . . I lost my sh\*\* and did this." Walsingham captured this statement on his pocket recorder, and that audio recording was played for the jury ("Statement 2").

Russell then was transported to the Woodstock Police Department, where he was interviewed a second time by Agent Duttry and Officer Manuel Barajas, another Woodstock Police detective (the "second interview"). Before conducting that interview, Agent Duttry again read Russell his rights under *Miranda* from a waiver form. Russell stated that he understood his rights and signed

the waiver form. During that interview, Russell said that he had lied to investigators in the earlier interview and that Waller never put anything in her mouth. To the contrary, Russell said Waller became unresponsive after he hit her the third time. He confirmed that he had become angry, grabbed Waller by the throat with two hands, held her down with one hand, and when she tried to scoot away from him, he hit her three times, until blood splattered on the wall. About two hours into that interview, Russell again invoked his right to counsel. A video recording of the second interview was played for the jury at trial ("Statement 3").

Early on the morning of March 4, 2017, approximately one-and-a-half to two hours after the second interview concluded, Russell was transported to the Cherokee County Jail[4] in a patrol car driven by Woodstock Police Officer Matthew Carroll. During the

---

[4] A warrant to search Russell's person was executed at the Cherokee County Jail, somewhere between 6:00 and 7:00 a.m. on March 4, 2017, and blood and DNA samples were collected. GBI testing of Russell's blood sample revealed the presence of methamphetamine, and the jury was charged that they could rely on the presence of methamphetamine in Russell's blood as circumstantial evidence to support the charge of violating the Georgia Controlled Substances Act.

drive, the two engaged in a conversation about family and religion, and Russell spontaneously stated that he "killed her . . . [and] murdered . . . the only person who's ever loved [him] truly." The entire trip between the Woodstock Police Department and the jail was recorded on video, and that recording was played for the jury at trial ("Statement 4").

A crime scene investigator testified that Waller's body was discovered lying on her back, covered in a comforter. Further investigation showed that Waller's hands were bound behind her back with a red nylon-type strap, and a similar red strap was discovered on one of her legs. The medical examiner testified that Waller had been beaten on her arms, legs, chest, face, and head, with hands, tools, or other objects, leaving numerous bruises, abrasions, and lacerations. She had also been strangled with either a ligature or hands, which resulted in her death. A computer circuit board and a handyman tool taken from the crime scene had evidence of Waller's blood, as well as Russell's DNA. Waller's DNA was also found on clothing collected from Russell at the jail.

The State presented additional testimony showing that in the days leading up to the murder, Russell and Waller had been arguing, and on one occasion, Russell had struck and put his hands on Waller, leaving bruises and other marks. B. W. testified that in the weeks before Waller's death, he had seen Russell spit on, slap, choke, push, shove, and hit Waller.

Although Russell has not challenged the sufficiency of the evidence supporting his convictions, consistent with our customary practice in murder cases,[5] we have reviewed the record and conclude that the evidence as summarized above was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that Russell was guilty of the crimes of which he was convicted and sentenced. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Russell asserts that the trial court erred when it denied his

---

[5] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (4) (846 SE2d 83) (2020). The Court began assigning cases to the December term on August 3, 2020.

motion to suppress the statements he made to law enforcement because (a) the statements were not made voluntarily as he was under the influence of methamphetamine and (b) he was questioned after he invoked his right to counsel.

In reviewing the trial court's denial of Russell's motion to suppress, "we accept the trial court's findings of fact and credibility determinations unless they are clearly erroneous; but where controlling facts are not in dispute, such as those facts discernible from a videotape, our review is de novo." *Thomas v. State*, 308 Ga. 26, 29 (2) (a) (838 SE2d 801) (2020) (citation and punctuation omitted). See also *Dawson v. State*, 308 Ga. 613, 619 (3) (842 SE2d 875) (2020).

(a) Russell argues that all his statements to law enforcement were involuntary because the statements were made while he was "clearly" under the influence of methamphetamine and that the introduction of those statements violated his due process rights. In deciding the admissibility of Russell's statements, "the trial court was required to consider the totality of the circumstances and

determine, by a preponderance of the evidence, whether the statements were knowingly and voluntarily given." *Thomas*, 308 Ga. at 29 (2) (a). And it is well settled that evidence of intoxication, standing alone, is not sufficient to render a statement involuntary. See *Davis v. State*, 301 Ga. 397, 405 (6) (a) (801 SE2d 897) (2017). Rather,

> [t]o determine whether a statement was made involuntarily due to intoxication or the influence of drugs, courts look to the totality of the circumstances and consider factors including lucidity, coherency, manner of speech, and awareness of circumstances.

*Evans v. State*, 308 Ga. 582, 587 (3) (a) (842 SE2d 837) (2020). See also *Carter v. State*, 285 Ga. 394, 398 (5) (677 SE2d 71) (2009); *Henson v. State*, 258 Ga. 600, 601 (1) (372 SE2d 806) (1988).

The trial court held a pretrial hearing over a two-day period to consider Russell's motion to suppress and the admissibility of his statements under *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964). During that hearing, the State played the recordings of Statements 1 to 4 and presented testimony from Officers Carroll and Barajas, Sergeant Hall, and Agents Duttry and

Walsingham. Sergeant Hall and Agent Duttry testified that based on their training and experience, they believed that Russell was under the influence of some kind of drug during the first interview. Nevertheless, neither Sergeant Hall nor Agent Duttry believed that the drug affected Russell's ability to understand what was happening or to understand his rights. Sergeant Hall noted that Russell understood enough to invoke his right to counsel. The trial court announced at the hearing that it would deny Russell's motion to suppress his recorded statements to police, later entering a written order memorializing that ruling.[6]

During his custodial interviews, Russell told investigators that after assaulting Waller and before leaving the apartment, he had consumed the last of the methamphetamine in his possession by

---

[6] The trial court, however, deferred ruling on Agent Walsingham's testimony about the unrecorded statements Russell made immediately after he arrived back at the apartment about his intention to commit suicide. Although the trial court's order stated that it would hold another hearing on that evidence at trial outside the presence of the jury, Russell's attorney informed the judge at trial that counsel would address the issue through cross-examination without a hearing, and the testimony was admitted.

injecting it intravenously. Russell left the apartment at least ten hours before he returned and was detained by law enforcement.[7] The first interview occurred shortly thereafter, and the recordings of Russell's subsequent statements demonstrate that he was coherent and aware enough to invoke his right to counsel on two separate occasions. Russell was talkative and although he sometimes skipped from topic to topic, his manner of speech was clear and understandable. He was responsive to the interviewers' questions, and when one of them said something Russell considered incorrect, he corrected the statement and pointed to factors that supported his version of events. At one point during the first interview, Russell withheld information, stating that it was "nothing I need to talk about." And although Russell made some unusual statements regarding Waller during that interview, he later admitted in the

---

[7] Russell told law enforcement that he spent the time between leaving the apartment and returning that night driving "all over hell and back." GPS data from Waller's vehicle showed that Russell left the apartment complex at 12:34 p.m. and from there he traveled throughout the metro-Atlanta area, making eleven stops, including at least one stop each in Acworth, Marietta, Forest Park, Stockbridge, Covington, Conyers, Atlanta, and back to Marietta, before returning to the apartment at 10:33 p.m.

second interview that he lied in that regard as part of a strategy to cover up his fault in her death.

We conclude that even if Russell was under the influence of methamphetamine, the evidence supports the trial court's determination that he made his statements voluntarily with an understanding of his rights. Accordingly, Russell's argument on this ground fails. See *Evans*, 308 Ga. at 587 (3) (a); *Davis*, 301 Ga. at 405 (6) (a).

(b) Russell also asserts that the statements he made after he first invoked his right to counsel (Statements 2, 3, and 4) were in violation of his rights under *Miranda*.

It is well settled that when a suspect asks for a lawyer during a custodial interrogation, the suspect may not be subjected to further interrogation by law enforcement "until an attorney has been made available or until the suspect reinitiates the conversation." *State v. Pauldo*, __ Ga. __, __ (2) (844 SE2d 829) (2020) (citation and punctuation omitted) (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (II) (101 SCt 1880, 68 LE2d 378)

(1981)). See also *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (103 SCt 2830, 77 LE2d 405) (1983) (plurality opinion) (*Edwards* created "a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers[.]"). Therefore, the first step in considering whether police honored the suspect's invocation of his right to counsel is to determine whether all interrogation ceased after the invocation. See *Pauldo*, __ Ga. at __ (2). "In this context, 'interrogation' is defined as 'express questioning by law enforcement officers' or its functional equivalent — any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *State v. Brown*, 287 Ga. 473, 476-77 (2) (697 SE2d 192) (2010) (citations and punctuation omitted). The law does not require, however, that all communications between the suspect and law enforcement must cease after the suspect invokes his right to counsel. "[P]olice statements and actions normally attendant to arrest and custody" are not considered "the functional equivalent of interrogation," and thus, they are permitted. *Driver v. State*, 307 Ga. 644, 648 (2) (b)

(837 SE2d 802) (2020) (citation and punctuation omitted)).

Moreover, once a defendant invokes his right to counsel, any subsequent statements resulting from police interrogation outside the presence of counsel "are admissible only if the defendant himself initiates the communications with law enforcement authorities." *Pauldo*, __ Ga. at __ (2) (citation and punctuation omitted). See also *Dozier v. State*, 306 Ga. 29, 35 (4) (b) (829 SE2d 131) (2019). "Initiation" in this context "requires not only that the defendant speak up first but also that his words reflect a desire to discuss the investigation at hand[.]" *Driver*, 307 Ga. at 646 (2) (a) (citation and punctuation omitted). And, a suspect's initiation of renewed contact cannot be "the product of past police interrogation conducted in violation of the suspect's previously-invoked rights." *Mack v. State*, 296 Ga. 239, 248 (2) (b) (765 SE2d 896) (2014).[8] To make that determination, we must consider

---

[8] Although *Mack* involved the invocation of the right to silence, our analysis there applied authority from *Edwards* and other cases addressing the invocation of the right to counsel because we saw "no reason why the definition of 'initiation' should be any different in right to silence cases than it is in right to counsel cases." 296 Ga. at 246 (2) (b) n.5.  See also *Pauldo*, __ Ga. at __ (2).

the entire sequence of events leading up to the suspect's renewal of contact, . . . including but not limited to the lapse of time between [any] unlawful interrogation and the renewed contact, any change in location or in the identity of the officers involved from one interview to the next, and any break in custody between interviews.

Id. Finally, "[i]f it is determined that a suspect reinitiated communication with law enforcement, courts then must determine under the totality of the circumstances whether the suspect voluntarily, knowingly, and intelligently waived his rights under *Miranda*." *Pauldo*, __ Ga. at __ (2). See also *Wells v. State*, 307 Ga. 773, 776 (2) (838 SE2d 242) (2020).

We apply these principles in our review of Russell's statements to law enforcement following the invocations of his right to counsel.

(i) *Statement 1*. Although Russell does not assert that the first interview was a violation of his right to counsel,[9] Russell first invoked this right approximately two hours into that interview, and we must begin our analysis there in order to determine whether law

---

[9] The audio recording of Statement 1 reflects that Sergeant Hall read Russell his rights under *Miranda* before the interview, and Russell verbally waived his rights.

enforcement honored Russell's invocation. Because the audio recording of Statement 1 shows that all interrogation ceased after Russell asked for an attorney, we conclude that Sergeant Hall and Agent Duttry honored Russell's initial exercise of his right to counsel. See *Driver*, 307 Ga. at 649 (2) (b).[10]

(ii) *Statement 2.* Russell was subsequently placed under the supervision of Agent Walsingham, and the two stood outside waiting for the arrival of an officer from the Woodstock Police Department to drive Russell to the police department. No evidence exists that Agent Walsingham engaged in any interrogation of Russell, or its functional equivalent, during their brief time together. To the contrary, Agent Walsingham testified that he did not ask Russell any questions, but Russell made unsolicited statements and asked to speak again with Sergeant Hall and Agent Duttry to let them know that he lied in the first interview and that he killed Waller on purpose. Although the full exchange between Russell and Agent

---

[10] Russell does not assert on appeal that there was any interrogation by law enforcement not captured on one of the recordings.

Walsingham was not recorded, the agent testified about the exchange, and the trial court evidently credited that testimony in denying the motion to suppress. Accordingly, because the evidence supported the trial court's finding that Russell's statement to Agent Walsingham was spontaneous and voluntary, the trial court did not err in admitting Statement 2.

(iii) *Statement 3*. Statement 3, however, was the product of a custodial interrogation of Russell in the absence of an attorney after he invoked his right to counsel. Therefore, we must determine whether the trial court properly concluded that the statement was admissible on the grounds that it resulted from a reinitiation of communications by Russell unprompted by improper police interrogation or its functional equivalent.

The second interview took place over an hour after the first interview ended, and during this interval, Russell was moved from the vehicle in which the first interview occurred, kept outside under Agent Walsingham's supervision, and transported to the police station by a Woodstock Police officer. Neither Agent Walsingham

nor the officer had any involvement in the first interview, and no evidence exists that either of them engaged in any interrogation of Russell or its functional equivalent during their time with him. To the contrary, as explained above, Russell spontaneously told Agent Walsingham that he wanted to speak to Sergeant Hall and Agent Duttry again to let them know that he lied in his first interview.

At the station, Russell was placed in an interview room alone for at least 11 minutes before Agent Duttry and Officer Barajas entered the room. When Russell began to say that he lied in the earlier interview, Agent Duttry stopped Russell and reminded him that he had earlier advised them that he did not want to say anything else without an attorney. Russell replied that he was willing to talk without an attorney. Agent Duttry asked Russell to confirm that he had reached out to talk to them through another agent, and he confirmed that he had. Agent Duttry then re-read Russell his rights under *Miranda* from a waiver-of-rights form. In completing that form, both before and after reading Russell his rights, Agent Duttry asked questions seeking biographical

information, including Russell's address, age, date of birth, and education level, and whether he could read and write.[11] After Russell initialed and signed the waiver-of-rights form, Agent Duttry began the interrogation by asking Russell what he wanted to tell her.

Under these circumstances, we conclude that the second interview was not the result of any improper interrogation in violation of Russell's right to counsel or any coercion on the part of police; rather, the record supports the trial court's determination that the interview resulted from Russell's voluntary reinitiation of communication with law enforcement with the express intent to talk about Waller's murder. See *Haynes v. State*, 269 Ga. 181, 183 (4) (496 SE2d 721) (1998) (defendant determined to have reinitiated communications following assertion of right to counsel, where interrogation ceased immediately after invocation, but defendant later volunteered to another officer not involved in the interrogation

---

[11] It is well settled that such "[b]asic biographical questions . . . are an exception to *Miranda* because" they "are unrelated to the investigation and serve a legitimate administrative need and therefore do not qualify as 'interrogation.'" *Kirby v. State*, 304 Ga. 472, 476 (2) (b) (819 SE2d 468) (2018).

that his previous statement was false).

Moreover, considering the totality of the circumstances, including, but not limited to, the lack of any evidence of police coercion, Russell's clear and intentional reinitiation of communications with law enforcement, the re-reading of his rights under *Miranda,* and Russell's execution of the waiver-of-rights form, we conclude that Russell voluntarily, knowingly, and intelligently waived his rights before the second interrogation began. See *Wells*, 307 Ga. at 776 (2) (defendant voluntarily, knowingly, and intelligently waived his rights where video recording showed defendant comprehended his rights as read to him, and he signed a waiver of rights form). Accordingly, we ascertain no error in the trial court's denial of Russell's motion to suppress Statement 3.

(iv) *Statement 4.* Russell asserts that the trial court should have suppressed his incriminating statement to Officer Carroll because that statement was made after the officer asked questions about Russell's family.

In considering whether the trial court erred in denying

Russell's motion to suppress Statement 4, we start by examining whether law enforcement honored Russell's second invocation of his right to counsel, which occurred approximately two hours into the second interview. After Russell asked for a lawyer, Agent Duttry and Officer Barajas immediately stopped their interrogation and left the interview room.[12] Thereafter, Russell was left alone in the interview room for approximately one-and-a-half hours while law enforcement officers sought a warrant to search his person. Police officers occasionally entered the room to check on Russell,[13] but the recording shows no evidence that any law enforcement officer engaged in any interrogation or its functional equivalent.

---

[12] Although Officer Barajas returned less than three minutes later to ask Russell to provide his phone and social security numbers, such biographical questions, like those asked by Agent Duttry, were not a violation of Russell's invocation of the right to counsel. See *Kirby*, 304 Ga. at 476 (2) (b).

[13] As a result of these occasional interruptions, Russell's handcuffs were loosened, he was provided water and food, and he was escorted out of the room for a smoking and bathroom break. Russell also was asked if he would mind if fire department personnel came in to draw his blood once the warrant was obtained, but that procedure was performed later at the county jail after the warrant was issued. Such communications about "routine incidents of the custodial relationship" are considered neither initiation of communication by a suspect nor interrogation by police. See *Bradshaw*, 462 U.S. at 1045; *Pauldo*, __ Ga. at __ (3) (a).

Accordingly, we conclude that law enforcement officials honored Russell's invocation of his right to counsel while he remained at the Woodstock police station.

When he left the station, Russell was placed in Officer Carroll's patrol car for transport to the jail. Officer Carroll testified that Russell was talking before the officer placed him in the car, continued talking while the officer radioed in his departure, and persisted in talking while the officer spoke on the phone with a supervisor about an unrelated matter. The patrol car video recording supports Officer Carroll's testimony. When Officer Carroll finished his phone call, he told Russell that the phone conversation had been unrelated to Russell's case, and the two then engaged in a conversation about their families and religion. During that discussion, Russell turned the conversation to himself and spontaneously said that he had killed "the only person who ever loved [him ]truly." Although Officer Carroll asked questions and engaged in social conversation with Russell before Russell made this statement, the topics discussed were prompted by Russell's own

statements and unrelated to Russell's case. There is no evidence that Officer Carroll interrogated Russell or otherwise said anything or acted in any way that he should have known was reasonably likely to elicit an incriminating response.

Because the evidence supports the trial court's finding that Russell's statements in the patrol car were spontaneous and voluntary, we see no error in the trial court's denial of Russell's motion to suppress Statement 4. See *Driver*, 307 Ga. at 650 (2) (b) ("[A] police officer's response to a direct inquiry by the defendant does not constitute 'interrogation.'") (citation and punctuation omitted)); *Brown*, 287 Ga. at 477 (2) (where police asked no questions about defendant's crimes following his invocation of the right to counsel and defendant was voluble throughout his interactions with police, introducing various topics, defendant's incriminating statements were not the result of improper interrogation).

3. In a separate enumeration of error, Russell contends that the trial court erred in failing to properly instruct the jury at the

beginning of Russell's trial on the concept of reasonable doubt and that the burden never shifts to the defendant to prove anything during trial. Relatedly, he also asserts that he received constitutionally ineffective assistance of trial counsel because his lawyer failed to object to the pretrial jury instruction. Both claims fail.

(a) Because Russell's trial counsel failed to object to the pretrial jury charge, Russell's argument that the charge was inadequate is waived for ordinary appellate review, and we are limited to reviewing the charge for plain error. See *White v. State*, 291 Ga. 7, 8 (2) (727 SE2d 109) (2012); *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011). See also OCGA § 17-8-58 (b). Russell makes no mention of plain error in his argument on appeal and thus makes no attempt to show that his challenge meets all four requirements for demonstrating plain error. See *Howard v. State*, 307 Ga. 12, 15 (2) (834 SE2d 11) (2019) (A showing of plain error requires "that the error was not affirmatively waived; that it was obvious beyond reasonable dispute; that it likely affected the outcome of the

proceedings; and that it seriously affected the fairness, integrity, or public reputation of the proceedings."). Russell argues only that the trial court committed harmful error in failing to instruct the jury before trial on reasonable doubt and Russell's lack of any burden to prove anything at trial.

"In reviewing a challenge to the trial court's jury instruction, we view the charge as a whole to determine whether the jury was fully and fairly instructed on the law of the case." *Walker v. State*, 308 Ga. 33, 36 (2) (838 SE2d 792) (2020) (citation and punctuation omitted). See also *Wood v. State*, 243 Ga. 273, 274 (2) (253 SE2d 751) (1979) (applying the same review to challenge to pretrial charge). The trial court instructed the jury in its pretrial charge that Russell entered the trial "presumed to be innocent," and that presumption remained until sufficient evidence was presented to overcome that presumption by a showing of guilt beyond a reasonable doubt. The court also charged that the State had the burden to prove each essential element of the offenses charged and that after hearing the facts of the case, the jury must acquit Russell if the minds of jurors

were "wavering, unsettled, and unsatisfied." Russell does not argue that this charge misstated the law; rather, he asserts that it was incomplete because the trial court did not give a full and complete charge on reasonable doubt or instruct the jury on a defendant's lack of burden of proof. However, in its final jury charge, the trial court further instructed the jury on the definition of reasonable doubt, that the State had the burden of overcoming the presumption of innocence with evidence showing Russell's guilt beyond a reasonable doubt, that Russell had no burden of proof whatsoever, and that the burden of proof never shifted to him to prove his innocence. Therefore, before retiring to consider the evidence in the case, the jury was fully instructed on the concepts of reasonable doubt and the defendant's lack of a burden of proof.

Considering the jury charge as a whole, we conclude that the trial court provided the jury with a full and fair instruction on the law applicable to Russell's case, and we ascertain no error. See *Rowland v. State*, 306 Ga. 59, 69 (7) (829 SE2d 81) (2019) (reversal not warranted where charge as a whole properly informed the jury

regarding the burden of proof and the meaning of reasonable doubt).

Because Russell failed to show any error by the trial court in charging the jury, he cannot establish obvious error beyond reasonable dispute as required to prove plain error. See *Collier v. State*, 288 Ga. 756, 763 (1) (c) (707 SE2d 102) (2011) (Nahmias, J., concurring) (Where "there was no reversible error, . . . it follows that there could be no plain error either (since plain error does not exist in the absence of reversible error)."). Accordingly, Russell's argument regarding the jury instruction fails.

(b) Likewise, Russell has failed to show ineffective assistance of counsel on this ground. To establish his claim of ineffective assistance of counsel, Russell must show both that his counsel's performance was constitutionally deficient and that absent this deficiency a reasonable probability exists that the outcome of his trial would have been different. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). "Because it was not error for the trial court to give the jury instruction [Russell] complains of on appeal, and because deficient performance is not

shown by counsel's failure to raise a meritless objection to a jury charge, [Russell's] claim of ineffective assistance of counsel fails." *Martin v. State*, 308 Ga. 479, 484 (2) (841 SE2d 667) (2020) (citation and punctuation omitted).

4. Russell contends that his sentence is improper because (a) the offense of aggravated assault in Count 4 should have merged with the malice murder conviction in Count 1 and (b) the sentence on Count 5 contains a scrivener's error.

(a) Turning first to the merger issue, we note that the indictment charged Russell with malice murder "by using his hand and hands and an unknown object, the exact description of which is unknown . . . to strangle . . . Christy Waller." Count 4 of the indictment alleged that Russell committed the offense of aggravated assault, family violence, by using "his hand and hands, a piece of a laptop computer, and an unknown object, the exact description of which is unknown . . . , by repeatedly striking the said Christy Waller about her head, face, extremities and body causing multiple

lacerations and contusions."[14] Russell contends that the two convictions should have merged because no evidence was presented of a deliberate interval between the infliction of the injuries alleged in Count 4 and Waller's death by strangulation. The State agrees that Georgia law mandates the merger of these two convictions.

The evidence at trial showed that while in a rage, Russell grabbed Waller by the throat, held her down by the throat, and hit her until she was unresponsive, only stopping when he saw blood hit the wall. No evidence exists of any deliberate interval between Russell's assaults against Waller. "Merger generally is required when there is no deliberate interval between the non-fatal injuries that form the basis for aggravated assault and the fatal injury that forms the basis for the murder." *Young v. State*, 305 Ga. 92, 95 (2) (823 SE2d 774) (2019). Because there was no evidence in this case

---

[14] The other charge of aggravated assault, family violence, under Count 3 of the indictment alleged that Russell committed an assault against Waller "with an object and objects which when used offensively against a person is likely to and did result in strangulation, to wit: his hand and hands and an unknown object, the exact description of which is unknown to the Grand Jury." The trial court merged Count 3 into Count 1 for sentencing, but did not merge Count 4.

of a deliberate interval between the beating and the murder by strangulation, we conclude that the aggravated assault based on the beating should have merged into the malice murder. Id. (merger required when no evidence of a deliberate interval between the beating alleged as aggravated assault and the strangulation alleged as murder); *Outler v. State*, 305 Ga. 701, 704 (1) (b) (827 SE2d 659) (2019) (merger of aggravated assault based on shooting merged with malice murder charge based on a beating where no evidence existed of a deliberate interval between these acts). Therefore, we vacate Russell's conviction and sentence under Count 4.

(b) Russell also notes that Count 5 of his written sentence reflects that he was sentenced for "Aggravated Assault, Family Violence," but Count 5 of Russell's indictment alleged that Russell committed "Aggravated Battery-Family Violence." Russell acknowledges, however, that during the oral pronouncement of the sentence, the trial court sentenced Russell on Count 5 using only the count number, without reference to the underlying crime charged. Russell suggests that the proper remedy for the scrivener's error is

to remand the case to the trial court for correction of the error, and the State agrees. See *Manley v. State*, 287 Ga. App. 358, 360 (3) (651 SE2d 453) (2007) (citing *Chaney v. State*, 281 Ga. 481, 482-83 (2) (640 SE2d 37) (2007)). Accordingly, we remand the case for the trial court to correct the scrivener's error in Russell's written sentence on Count 5.

*Judgment affirmed in part and vacated in part, and case remanded in part. All the Justices concur, except Melton, C. J., not participating.*

Decided September 8, 2020.

Murder. Cherokee Superior Court. Before Judge Harris.
*Amanda G. Speights*, for appellant.
*Shannon G. Wallace, District Attorney, Cliff Head, Rachel M. Ashe, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth Rosenwasser, Assistant Attorney General*, for appellee.