306 Ga. 59
FINAL COPY

S19A0289.  ROWLAND v. THE STATE.

ELLINGTON, Justice.

Jesse Lynn Rowland was convicted of felony murder in connection with the shooting death of Mike Whittle.[1]  On appeal, he contends that the trial court erred in admitting his custodial statements, in making certain evidentiary rulings, and in charging the jury. Finding no reversible error, we affirm.

Viewed in the light most favorable to the verdict, the evidence at trial showed the following. Rowland and Whittle were friends, and both belonged to a group of "dope buddies" who bought, sold, or used methamphetamine, opiates, or other drugs. Rowland described

_____

[1] The murder occurred on September 19, 2013. On December 13, 2013, a Laurens County grand jury indicted Rowland for malice murder and two counts of felony murder, each predicated on an aggravated assault. Following a trial held on February 22-25, 2016, the jury found Rowland guilty of one count of felony murder. The trial court sentenced him to life imprisonment on March 11, 2016. Rowland filed a motion for a new trial on March 16, 2016, which he later amended on January 23, 2018. Following a hearing on February 23, 2018, the trial court denied the motion on September 13, 2018. Rowland filed a timely notice of appeal, and his case was docketed in this Court for the term beginning in December 2018 and submitted for decision on the briefs.

Whittle and himself as "pill heads." In the months before the shooting, members of the group suspected that one of them had become an informant and was "snitching" to the local police. In fact, Rowland's cousin, Dana Floyd, had been arrested on weapons charges and had become a confidential informant for the Bleckley County Sheriff's Department. Rowland feared that Whittle and others had assumed, given his relationship to Floyd, that he was also a snitch and that they intended to kill him. One of Rowland's friends testified that he and Rowland had heard rumors that Whittle and Floyd were conspiring to give Rowland a lethal injection of lidocaine and alcohol. In text messages exchanged between Whittle and Rowland shortly before the shooting, Whittle complained that Floyd was "singing like a canary." Whittle's texts imply that he also suspected Rowland of implicating him in criminal activity. Whittle warned Rowland to "be careful."

Rowland testified that, at around 4:30 a.m. on September 19, 2013, he was awakened by a call from Whittle, who was looking "for a fix" of methamphetamine. Rowland left his girlfriend's parents'

house and drove to Whittle's home to tell him "I don't sell drugs." When Rowland arrived, Whittle was standing in his doorway. Rowland believed that Whittle, whom he described as "fully dressed and waiting," was behaving strangely. He also thought he saw two other people hiding in the shadows. Rowland testified that Whittle, who was known to carry a knife, walked up to his driver's side window, angrily accused him of being "out to get" him, and then reached through the window and forcefully tried to pull him out of the truck. Rowland testified that he grabbed his pistol, pushed Whittle away from him, and then shot Whittle in an act of self-defense. Rowland said he was close enough to Whittle to see the muzzle fire from his pistol illuminate Whittle's face.

Forensic evidence adduced by the State contradicted Rowland's account of the shooting. The State's experts testified that Whittle had been shot through the left cheek, at a slightly downward trajectory, and from an indeterminate range that left no stippling or gunpowder residue on his face. There was no blood on or near the driver's side door of the truck. They found Whittle's blood, however,

on the truck's tailgate and on the bottom left leg of Rowland's jeans. Analysis of blood spatter on Rowland's truck indicated that Whittle had been near the tailgate of Rowland's truck and fairly low to the ground, possibly on his hands and knees, when he was shot. The police found a single shell casing consistent with Rowland's .380 pistol on the ground near the body. Whittle had been clothed only in his boxer shorts when he was shot. The police found no knife or other weapon on or near the body.

After the shooting, Rowland returned to his girlfriend's house. On his way there, he discarded his pistol. He also sent text messages to his girlfriend using Whittle's phone. When Rowland arrived, the girlfriend's mother saw him and noticed that he had something red on his fingers. When she asked what it was, Rowland responded "Let's just say I took care of a problem I had and it won't be a problem anymore." Shortly thereafter, Rowland drove back to Whittle's home and tried to move the body, but he could not lift it. When Rowland learned from his girlfriend that the police were looking for him, he drove to his house. On the way there, he collided

with a vehicle driven by Whittle's son.

About an hour and a half after the collision, Brian Scarborough, an investigator with the Laurens County Sheriff's Office, went to the scene of the collision. He arrested Rowland for Whittle's murder and read him his rights under *Miranda*.[2] Rowland declined to speak with the investigator and invoked his right to counsel. At 10:47 a.m., Rowland filled out a jail "inmate request form," asking to speak with Scarborough. Minutes later, Rowland met with Scarborough and another investigator, Lance Padgett, and agreed to make a statement. In the audio-recorded statement, which was played for the jury, Rowland denied any involvement in Whittle's death, claiming at first that he had been at his girlfriend's house and then, later, that he had been in Macon. He said he had lost his cell phone two days earlier. He told the investigators that Whittle had made many enemies and that any one of them could have killed him. Rowland also insisted that he was not a "snitch."

On September 23, Rowland again asked to speak with

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Scarborough about the case. The investigator read Rowland his rights, and Rowland agreed to give a statement. Rowland told Scarborough that he suspected that, on the night of the shooting, Whittle had lured him to his home. He said that Whittle and two others menaced him when he arrived and that Whittle had either reached for his pocket or had something in his hand. When Whittle swung at him, Rowland shot him with his pistol. After that, "everything just went crazy," and he had no memory of what happened to his pistol or how he came to have Whittle's cell phone. Rowland then said he went back to Whittle's house after the shooting to try to help him, but that he could not find his phone to call 911. He also admitted trying to put Whittle's body in the truck, but that he could not lift it.

1. Rowland does not dispute the legal sufficiency of the evidence supporting his conviction. Nevertheless, as is this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to

authorize a rational jury to find Rowland guilty beyond a reasonable doubt of felony murder. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

2. Rowland contends the trial court erred in admitting, following a *Jackson-Denno*[3] hearing, his September 19, 2013 custodial statements. He argues that the statements were not voluntary under the totality of the circumstances because he was not re-advised of his *Miranda* rights after he asked to speak with Scarborough and because he was under the influence of drugs. For the following reasons, we find no error.

Rowland does not dispute that the investigator ceased his efforts to question him after he invoked his right to counsel and his right to remain silent while he was seated in the patrol car. He also

---

[3] *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

does not dispute that he was the one to initiate contact after earlier invoking his rights. The record in this case clearly shows that Rowland filled out an inmate request form asking specifically for Scarborough; moreover, the transcript of the interview shows that Rowland wanted to talk about the charges against him and the circumstances of Whittle's death. Thus, the question before us is whether, after having initiated contact with Scarborough, Rowland's custodial statements were voluntary under the totality of the circumstances.

If "a defendant is found to have initiated contact with authorities and then knowingly and intelligently waived his rights, his ensuing statements will be considered properly obtained." *Mack v. State*, 296 Ga. 239, 244 (2) (765 SE2d 896) (2014), citing *Oregon v. Bradshaw*, 462 U. S. 1039, 1045 (103 SCt 2830, 77 LE2d 405) (1983) (plurality opinion). See also *State v. Darby*, 284 Ga. 271, 272-273 (2) (663 SE2d 160) (2008) ("[A]n analysis of whether a suspect who has invoked his right to counsel under *Miranda* . . . has later waived that right proceeds in two steps. First, a determination as to whether the

defendant initiated further talks with the police, and second, if so, whether his waiver was shown to be voluntary under the totality of the circumstances." (citation, punctuation and emphasis omitted)).

At the *Jackson-Denno* hearing, Scarborough testified that he advised Rowland of his *Miranda* rights at the scene of the collision between Rowland and Whittle's son, which was about two-and-a-half hours before Rowland asked to speak with him at the jail. Rowland contends that he has little memory of the September 19 interview because he was high on clonazepam. Scarborough testified that he did not recall Rowland being intoxicated at the scene or at the jail, but that if Rowland had appeared impaired, he would have stopped the interview. Investigator Padgett, who sat in on the interview, also did not recall Rowland appearing impaired. The transcript of the interview shows that, when Scarborough accused Rowland of being "in fairy land," Rowland specifically asserted that he was "clear minded" and dared the investigator to prove that he was "on" anything. Scarborough responded: "I'm not saying you [are] on anything." The investigator testified that when he accused

Rowland of being "in fairy land," he meant that he did not believe Rowland was telling him the truth.

Further, Scarborough testified that he did not force, threaten, or make any promises to Rowland. He also testified that Rowland never asked to stop the interview, asked to speak to an attorney, or reasserted his right to remain silent. Although the investigator did not repeat Rowland's *Miranda* rights at the beginning of the interview, the investigator reminded Rowland of their previous conversation in which Rowland had asked for an attorney:

> SCARBOROUGH: Time now is 11:00 a.m. It's September 19, 2013 [and we are] here at Laurens County LEC. [Going to] be speaking with a Jesse Rowland. [He] is a suspect in a case we [were] working earlier this morning with the shooting death of Mike Whittle. I have recently spoken with Jesse. [I] read him his *Miranda* warning, verbal *Miranda* warnings. [H]e advised me he wanted an attorney. At this time I've been contacted by Sgt[.] Peacock[,] the jail assistant administrator[, who] brought me an inmate request form saying that Jesse wants to speak with me again in reference to this case. It was picked up by Sgt[.] Peacock [on] September 19, 2013 at approximately 10:47 a.m. Jesse[, d]id you fill this request out?
> ROWLAND: Yes.
> SCARBOROUGH: Okay. So, you don't have no problem talking with us?

ROWLAND: No.

The interview then continued with Rowland asking about his charges, inquiring about the evidence against him, and then denying any involvement in the shooting. The investigators asked relatively few questions. Further, during the eight-minute interview, Scarborough told Rowland several times that if he did not want to talk to him or to cooperate, "that's fine," but that he was not going to "sit [t]here and argue" with Rowland about the sufficiency or nature of the evidence against him.

The record shows that Rowland had been advised of his *Miranda* rights just a few hours before asking to speak with Scarborough. Prior to commencing the interview, the investigator reminded Rowland that he had been read his *Miranda* rights and that he had asked for an attorney. After being so informed, Rowland indicated that he had no problem making a statement. These circumstances support the trial court's finding that Rowland made a knowing waiver of his rights to remain silent and to have an attorney present. Compare *Sanders v. State*, 182 Ga. App. 581, 582-

583 (1) (356 SE2d 537) (1987) (The defendant waived his previously invoked right to counsel when he reinitiated conversation with the police, was reminded that he had asked for a lawyer, and said he wanted to continue making a statement.), with *Vergara v. State*, 283 Ga. 175, 182 (2) (657 SE2d 863) (2008) (In an interview conducted two days after the initial invocation of the right to counsel, the investigator neither reread nor reminded the defendant of his *Miranda* rights. While the investigator told the defendant that he did not have to speak with him, neither the investigator nor the defendant mentioned an attorney. Given these circumstances, the trial court erred in finding the defendant's statement admissible.).

Further, as the State correctly argues, "the intoxication of the accused does not automatically invalidate his or her waiver of *Miranda* rights[.]" *Stanley v. State*, 283 Ga. 36, 40 (2) (a) (656 SE2d 806) (2008). See also *Forehand v. State*, 271 Ga. App. 746, 747 (611 SE2d 78) (2005) ("[I]ntoxication, standing alone, does not render a statement inadmissible. If the evidence is sufficient to establish that the defendant's statement was the product of rational intellect and

free will, it may be admitted even if the defendant was intoxicated when he made the statement." (citation and punctuation omitted)). In this case, although Rowland now asserts that he was high on pills, the investigators' testimony and the recorded interview indicate that, even if Rowland had consumed intoxicants, his mind was nevertheless clear enough to make a knowing and voluntary waiver of his rights and to speak to the investigator without an attorney. Thus, when all of the evidence regarding the voluntariness of Rowland's statement is considered, the trial court's finding that those statements were admissible is not clearly erroneous. See *Wallace v. State*, 296 Ga. 388, 390 (3) (768 SE2d 480) (2015) (holding that, despite the fact that the defendant told the detective he had used cocaine a few hours before providing his statement, in light of detective's testimony that defendant "did not appear to be under the influence of cocaine or any other drugs, alcohol, or medication, that he appeared to understand his rights and waived them orally, and that he was coherent and answered questions appropriately," the trial court did not err in admitting statement).

3. Rowland contends that the trial court erred in denying his request to redact portions of his audio-recorded September 23, 2013 custodial interview prior to admitting it into evidence because the investigators asked questions or elicited statements from Rowland that violated the categorical or "bright-line" rule this Court announced in *Mallory v. State*, 261 Ga. 625, 629-630 (5) (409 SE2d 839) (1991), which excluded evidence of a criminal defendant's pre-arrest "silence or failure to come forward" to law enforcement on the ground that such evidence is always "far more prejudicial than probative." Id. at 630 (5). Just before opening statements, Rowland's counsel asked the court to redact, inter alia, any discussion between Rowland and the investigators concerning Rowland's decision not to call 911 after the shooting.[4] The trial court declined to redact the

---

[4] Rowland argues that the court should have redacted that portion of his statement where the investigator asked "did you ever think of calling 911" after Rowland claimed that, despite the fact that he "feared for [his] life" from people who were out to get him, he went back to the scene of the shooting "to get [Whittle] help." Rowland also asked the court to redact statements concerning his flight from the scene and anything else that "a law abiding person would do if they had just killed somebody in self-defense." Evidence showing that a defendant attempted to evade arrest, however, may be admissible as evidence of flight, and statements about flight are generally admissible as

custodial interview on the ground that Rowland's statements had been "determined to be voluntary" in a pre-trial *Jackson-Denno* hearing. In its order denying Rowland's motion for a new trial, the trial court concluded that its decision not to redact that portion of the statement concerning Rowland's failure to call 911 violated *Mallory* but that the error was harmless. The court found, and the record supports, that Rowland's failure to call 911 and subsequent flight from the scene was mentioned only once at trial. Given that the comment on Rowland's pre-arrest silence "was elicited in a harmless manner, was isolated within the interview, was not used in argument by the State, and there was otherwise overwhelming

circumstantial evidence of guilt. See, e.g., *United States v. Borders*, 693 F2d 1318, 1324-1325 (II) (11th Cir. 1982) ("It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, [is] admissible as evidence of consciousness of guilt, and thus of guilt itself." (citation and punctuation omitted)). See also *Renner v. State*, 260 Ga. 515, 517 (3) (b) (397 SE2d 683) (1990) ("The fact that a suspect flees the scene of a crime points to the question of guilt in a circumstantial manner."). Rowland also complains that the court should have redacted a portion of the interview where the investigator asked him why he shot Whittle instead of simply driving away. That question is not a comment on Rowland's pre-arrest silence or his failure to come forward after the shooting. Rather, the question challenges the reasonableness of Rowland's use of deadly force.

evidence [of guilt]," the trial court concluded that any error in "failing to redact this portion of the interview was harmless and not grounds for a new trial."

This case was tried in 2016, after the enactment of Georgia's new Evidence Code. As we recently explained, *Mallory's* non-constitutional, categorical rule excluding all comment upon a defendant's pre-arrest silence or failure to come forward as far more prejudicial than probative "was abrogated by the new Evidence Code." *State v. Orr*, 305 Ga. 729, 736 (2) (827 SE2d 892) (2019). Evaluating whether the trial court in this case should have redacted Rowland's custodial statement "now requires careful consideration of what specific sorts of evidence that come within the broad phrase 'silence or failure to come forward' may be properly offered under which particular evidence rules and theories." Id. at 739 (4) (a). The trial court did not employ that analysis. Neither this Court nor the trial court need revisit whether the evidentiary ruling was correct, however. Even assuming the trial court's ruling was error, we agree that it was harmless. Given the strong evidence of Rowland's guilt

and the minimal use by the prosecutor of the challenged evidence of Rowland's pre-arrest failure to come forward, it is highly probable that any error in the admission of that evidence did not contribute to the verdict. See *Adkins v. State*, 301 Ga. 153, 158 (3) (a) (800 SE2d 341) (2017) ("A nonconstitutional error is harmless if it is highly probable that the error did not contribute to the verdict.").

4. Rowland contends the trial court erred when it prohibited him from introducing evidence that Whittle had once asked him and Floyd to murder Whittle's son. Rowland argues that the evidence was relevant to his affirmative defense of self-defense and supported his argument that he reasonably believed that Whittle might use deadly violence against him.

The record shows that the trial court held a pre-trial hearing on Rowland's motion to introduce, in support of his claim of self-defense, the following specific acts of violence: (1) Whittle had previously threatened to kill Rowland, (2) Whittle had previously solicited Rowland and Floyd to kill his son, and (3) Whittle was known to carry a knife. The trial court admitted the first and third

items, but excluded the second. The trial court considered whether Whittle's act of soliciting Rowland to kill his son was relevant to Rowland's claim of self-defense and concluded:

> Under this proffer, the Court cannot find the act is relevant to [Rowland]. Assuming there is sufficient evidence to show the proffer, there is insufficient evidence of [Whittle's] motive in asking [Rowland] to kill his son or any correlation between that motive and any motive against [Rowland]. The only purpose of this proffer can be to show [Whittle's propensity] to commit violent acts, which the Court has determined is not admissible. Further, the Court questions both the sufficiency of the proof and the balance of probative value versus prejudice. Therefore, the proffered act as to incident two is not admissible.

Pretermitting whether the trial court erred in excluding this evidence, any error was harmless. In his proffer, defense counsel stated that Rowland and Floyd would testify that Whittle, who was paranoid from his drug use, asked them to kill his son because his son was giving the police information about his drug use. It is unclear from this very brief proffer when and under what circumstances Whittle's request was made. Further, the proffer added little to the other, stronger evidence that was admitted in

support of Rowland's self-defense claim, specifically, evidence that Whittle had recently threatened to kill him with a lethal injection and that Rowland knew that Whittle carried a knife. Given the strong evidence of Rowland's guilt and the marginal and cumulative value of the excluded evidence, it is highly probable that any error in its exclusion did not contribute to the verdict. See *Peterson v. State*, 274 Ga. 165, 168 (2) (549 SE2d 387) (2001) (Given the strength of the other evidence of the victim's violent acts, it was highly probable that any additional evidence of prior violent acts would not affect the verdict, and any erroneous exclusion of that evidence was harmless.).

5. Rowland contends the trial court erred in denying his motion in limine to prevent the State from referring to Whittle as "the victim." He argues that, in allowing the State to refer to Whittle approximately 25 times during the course of the trial as "the victim," the court deprived him of a meaningful opportunity to present his theory of self-defense. If his actions were justified, Rowland argues, then there was no crime and, hence, no victim. The denial of a

motion in limine is reviewed on appeal for abuse of discretion. *McCray v. State*, 301 Ga. 241, 247-248 (3) (799 SE2d 206) (2017).

We disagree that the word "victim" is inherently prejudicial. In the case before us, it was obvious from the evidence and argument presented to the jury that Rowland admitted that he shot Whittle but nevertheless argued that it was not a crime because he acted in self-defense, thereby creating an issue for jury determination as to whether Whittle was the victim *of a crime*. Further, the trial court gave proper jury instructions on justification by reason of self-defense. Consequently, Rowland has failed to demonstrate reversible error in this regard. See id. (The trial court did not err in denying the defendant's motion in limine to preclude the State from referring to the deceased as a "victim" at trial because determining whether the deceased was a victim of a crime was an issue for the jury, and the trial court gave proper jury instructions regarding justification by reason of self-defense.).

6. Rowland contends the trial court "eroded" the presumption of innocence to which Rowland is entitled by using a prepared

verdict form that listed next to each offense charged the options of "guilty" or "not guilty," respectively. He argues that, given that a criminal defendant is entitled to a presumption of innocence, "not guilty" should come first on the verdict form. See OCGA § 16-1-5 ("Every person is presumed innocent until proved guilty."). In deciding whether a verdict form accurately presented the law and properly guided the jury, we review the form's language in conjunction with the rest of the trial court's jury instructions.

> In a criminal case, a verdict form is erroneous when the form would mislead jurors of reasonable understanding, or the trial court erroneously instructed the jury on the presumption of innocence, the State's burden of proof, the possible verdicts that could be returned, or how the verdict should be entered on the printed form. A preprinted verdict form is treated as part of the jury instructions which are read and considered as a whole in determining whether there is error.

(Citations and punctuation omitted.) *Cheddersingh v. State*, 290 Ga. 680, 682 (2) (724 SE2d 366) (2012).

The transcript of the trial shows that the jury was thoroughly and correctly charged on the presumption of innocence, the State's burden of proof, and the possible verdicts it could return. The verdict

form in Rowland's case did not misstate the law about the State's burden of proof or the presumption of innocence. Nor did the order in which "guilty" and "not guilty" were listed on the verdict form, when viewed in light of the rest of the court's instructions, mislead the jury. See *Rucker v. State*, 270 Ga. 431, 435 (5) (510 SE2d 816) (1999) ("[M]erely listing the possible guilty verdict option(s) before the 'Not Guilty' option does not render the verdict form misleading so as to constitute reversible error."). See also *United States v. Bell*, 750 Fed. Appx. 941, 943-944 (II) (11th Cir. 2018) (Listing "guilty" before "not guilty" on the verdict did not undermine the presumption of innocence and lessen the government's burden of proof where the instructions correctly charged the jury about the government's burden and the presumption of innocence.). Rowland asks us to overrule *Rucker*, "but we continue to find its reasoning sound and decline to do so." *Mitchell v. State*, 290 Ga. 490, 491 (2) (722 SE2d 705) (2012).

7. Rowland contends the trial court's jury instruction on reasonable doubt was misleading and improperly diminished the

State's burden of proof at trial. Specifically, he argues that the court should have struck from the pattern charge on reasonable doubt the following language: "However, the State is not required to prove the guilt of the accused beyond all doubt or to a mathematical certainty." He argues that the grammatically imprecise way the charge links the words "however" and "all doubt" and "mathematical certainty" could confuse the jury into believing that they could convict Rowland even though they had a reasonable doubt about his guilt. We have considered this argument before and have rejected it. See *Anthony v. State*, 298 Ga. 827, 833-834 (5) (785 SE2d 277) (2016) ("The fact that the sentence of which the appellant complains was introduced by the word 'however' does not change the meaning of 'all doubt' or 'mathematical certainty.' Even assuming that the use of those terms amounted to error, we will not reverse the judgment on that basis because the charge as a whole properly informed the jury of the State's burden of proof and the meaning of reasonable doubt." (citation omitted)). Consequently, this claim of error lacks merit.

Judgment affirmed. All the Justices concur.

Decided June 3, 2019.

Murder. Laurens Superior Court. Before Judge Flanders, Senior Judge.

Hogue, Hogue, Fitzgerald & Griffin, Laura D. Hogue, Susan D. Raymond, for appellant.

L. Craig Fraser, District Attorney, Leslie L. Ray, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General, for appellee.