313 Ga. 225
FINAL COPY

S21A1242.  HARRIS v. THE STATE.

WARREN, Justice.

After a jury trial that was held in July and August 2019, Demartre Harris was convicted of felony murder and other crimes for his involvement in two drive-by shootings that injured Laundon Alexander and Patrick Boyd and resulted in the death of Marcus Bowden.[1] Harris raises four claims of error on appeal: (1) that the

---

[1] On November 7, 2017, a Muscogee County grand jury indicted Harris for malice murder, felony murder (predicated on aggravated assault), three counts of aggravated assault (one predicated on the assault of Marcus Bowden, one predicated on the assault of Laundon Alexander, and one predicated on the assault of Patrick Boyd), possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon.  The trial court granted the parties' joint motion to bifurcate the trial, severing the possession-of-a-firearm-by-a-convicted-felon count from the other six counts.  At a trial from July 29 to August 5, 2019, a jury found Harris not guilty of malice murder but guilty of the remaining charges.  On July 29, 2019, Harris was sentenced to life in prison for felony murder, a consecutive 20 years (10 to serve) for the aggravated assault of Alexander, a concurrent 20 years (10 to serve) for the aggravated assault of Boyd, and a consecutive five years in prison for possession of a firearm during the commission of a felony.  The State agreed to nolle pros Harris's possession-of-a-firearm-by-a-convicted-felon charge.  The aggravated assault count for the assault of Bowden merged into the felony murder count for purposes of sentencing.  Through trial counsel, Harris filed a timely motion for new trial on August 26, 2019.  On September 3, 2019, Harris

evidence was insufficient to support his convictions; (2) that the trial court erred by admitting evidence pertaining to the weapons and ammunition that law enforcement officials found at the time of Harris's arrest; (3) that the trial court erred by admitting evidence pertaining to Harris's Facebook posts; and (4) that Harris received constitutionally ineffective assistance of counsel because his trial lawyer failed to call Dashauna Wilborn as a witness. For the reasons explained below, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at Harris's trial showed the following. On November 21, 2015, Harris picked up his girlfriend, Jackie Pearson, from a Piggly Wiggly grocery store and the two of them then went to the M&N Package Store in Columbus. As Pearson walked inside the package store, three men, whom she did not know, walked out.

filed a second motion for new trial. Through new counsel, Harris filed an amended motion for new trial on June 18, 2020. After a hearing and after receiving leave from the trial court, Harris filed a second amended motion for new trial. On December 14, 2020, following multiple hearings on Harris's motions for new trial, the trial court denied Harris's motion. On December 30, 2020, Harris filed a timely notice of appeal. The case was docketed in this Court to the August 2021 term and submitted for a decision on the briefs.

When Pearson exited the store, she observed the same men "jumping on" and "beating" Harris. The group of men who attacked Harris included Boyd, Robert Oestricher, and Oestricher's brother. According to Oestricher, multiple other people ran from "Ms. Mary's house"—a nearby house where he and his friends would "hang out"—to the package store when the fight broke out, and Boyd, Oestricher, and Oestricher's brother all ran back to Ms. Mary's house when the fight was over.

Harris was a member of the "Bounty Hunter Bloods" gang. About 15 minutes after he was attacked, he sent a Facebook message to a fellow gang member, Spencer Marshall, saying "Come get me blood, I just got jumped." As part of his exchange with Marshall, Harris messaged, "Everybody dies." Marshall later testified that the men who attacked Harris were members of rival gangs.

At approximately 6:00 p.m. on November 23—two days after Harris was attacked—Alexander and Boyd were standing in the yard at Ms. Mary's house. Alexander was there to visit Bowden and

other friends. While Alexander and Boyd were standing in the yard, Alexander heard a gunshot, and when he turned around he saw more gunshots coming from a "white Explorer" with "at least two" people in it. Alexander was shot in the thigh, and Boyd was shot in the leg. Boyd testified that his "leg broke after being shot," and he spent about two weeks in the hospital recovering.

The police arrived after the shooting and collected a total of five shell casings that were on a street adjacent to Ms. Mary's house. The shell casings included three Smith & Wesson .40-caliber shell casings, one PMC .25-caliber shell casing, and one .22-caliber shell casing.

The next day, Harris borrowed Pearson's white Ford Explorer at 11:00 a.m., when Pearson returned home from work. Antoine Gardner left with Harris in the Explorer. At 11:30 a.m., Bowden and Harold Prude visited Ms. Mary's house; Bowden went inside but Prude stayed outside. Prude testified that he was standing in the yard near the fence when he heard gunshots coming from an "SUV" that "looked like white, but I ain't had time to stand there and look."

4

Edward Wilson, who observed the shooting, believed the shots had been fired from a white Explorer. Prude testified that "five or six" gunshots were fired from the "back driver side" of the SUV. He could not tell how many people were inside the SUV, but testified that "it had to be two because somebody was driving." When the shots began, Prude ran toward the front of Ms. Mary's house. When the shooting stopped, Prude walked back "to see where everybody escaped" and found Bowden lying wounded by the back door. Bowden died of his injuries; an autopsy later revealed that he had been shot once in the right buttock and once in the abdomen. At approximately 11:45 a.m., Harris returned Pearson's white Explorer.

Officers arrived at the scene at about 11:55 a.m. and recovered six .40-caliber bullets, two .40-caliber shell casings, and a 9 millimeter cartridge. Law enforcement officials identified Harris as a suspect in Bowden's murder, and in the course of looking for Harris the next day, executed a search warrant on Gardner's house. They did not find Harris, but did find Gardner—who had left with Harris

5

in Pearson's Explorer on the day of Bowden's murder—and took him into custody. Officers also seized a pink Walther .22-caliber semi-automatic pistol that they found in the attic of Gardner's house. They also searched Pearson's white Explorer and found a .22-caliber shell casing under the rear passenger seat.

Approximately three months later, after further investigation revealed Harris's possible location, Lieutenant Lance Deaton and a team of officers secured and executed a search warrant on a residence that belonged to two of Harris's friends. Once the officers entered the home, they learned that Harris was barricaded inside one of the bedrooms. Officers breached the door and took Harris into custody. Under the cushion of the sofa located in the room in which Harris barricaded himself, Lieutenant Deaton located a loaded Taurus .45-caliber handgun with an extended magazine, along with .223-caliber and .357-caliber ammunition. The handgun was not the same caliber as the weapons believed to be used in the November 23 and 24 shootings.

At trial, a Georgia Bureau of Investigation ("GBI") firearm

6

examiner testified that the .40-caliber cartridge cases found at the scene of the November 24 shooting shared "individual characteristics"—"scratches that were imparted to the bullet or to the cartridge case when they were fired in that firearm"—with the .40-caliber cartridge cases found at the November 23 shooting scene, indicating they were fired from the same firearm. Specifically, the individual characteristics on the cartridge cases indicated that the firearm that imparted markings on both cartridge cases was a Springfield, an FN Browning, or a Taurus .40-caliber semi-automatic pistol. Moreover, the .40-caliber bullet recovered during Bowden's autopsy matched the .40-caliber casings recovered from the November 23 and 24 shooting scenes. The State also introduced evidence that on November 15, 2015—nearly a week before Harris was attacked at the M&N Package Store—Harris told Marshall on Facebook that he recently obtained an "XD Springfield .40."

With respect to the .22-caliber shell casing officers retrieved from Pearson's white Explorer, the GBI firearm examiner testified that the casing's individual characteristics indicated it was fired

7

from the pink .22-caliber pistol found in the attic of Gardner's house when Gardner was arrested.

Finally, the State tendered an expert whom the trial court qualified to testify about gang culture in the Columbus area. He testified that a low-ranking member of a gang, like Harris, would be required to retaliate against members of a different gang who disrespected him in order to retain his position in the gang. As part of the final jury instructions, the trial court charged on Georgia's "party to a crime statute," OCGA § 16-2-20 (a), instructing the jury that "[e]very party to a crime may be charged with and convicted of commission of the crime."

2. Harris contends that the evidence was legally insufficient to support his convictions because the case against him was entirely circumstantial and there was no direct evidence that he took part in either the November 23 or 24 drive-by shootings. Specifically, Harris asserts that there was no physical evidence and no witness that placed him at the scene of either shooting; that no murder weapon was ever found with respect to the November 24 shooting;

8

and that there was significant evidence that Gardner, who is now deceased, was the person who shot and killed Bowden.  Harris argues that the State failed to exclude the reasonable hypothesis that someone else—such as Gardner or another gang member—committed the crimes of which he was convicted, which included the murder of Bowden and the non-fatal shootings of Alexander and Boyd.  We disagree.

> When evaluating a challenge to the sufficiency of the evidence [as a matter of constitutional due process], we view all of the evidence presented at trial in the light most favorable to the verdict[s] and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted.

*Jones v. State*, 304 Ga. 594, 598 (820 SE2d 696) (2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979)).  "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts," *Smith v. State*, 308 Ga. 81, 84 (839 SE2d 630) (2020), and we do not "reweigh the evidence." *Ivey v. State*, 305 Ga. 156, 159 (824 SE2d 242) (2019)

9

(citation and punctuation omitted).

As a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. "Whether alternative hypotheses are reasonable, however, is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law." *Frazier v. State*, 308 Ga. 450, 453 (841 SE2d 692) (2020).

The evidence here, although circumstantial, was sufficient to convict Harris as a matter of constitutional due process and under Georgia statutory law. To begin, the State introduced evidence that Harris was a gang member and that he was attacked by rival gang members days before the November 23 and 24 drive-by shootings. Through its expert, the State also introduced evidence that Harris had a motive to retaliate against the men who attacked him. The State also established that the rival gang members who attacked Harris tended to congregate at the house where the November 23

10

and 24 shootings occurred and that Harris observed his attackers run away from the package store parking lot toward that house after he was attacked. The State further showed that, in response to questions about the attack, Harris messaged Marshall, "Everybody dies," from which the jury could infer that Harris had threatened to kill the men who had attacked him at the package store. And when police officers finally located Harris and sought to arrest him, Harris barricaded himself in a room with a gun and ammunition.

As to the November 24 shooting, Pearson's testimony placed Harris with Gardner in Pearson's white Explorer at 11:00 a.m., minutes before the 11:30 a.m. shooting that resulted in Bowden's death. And at least one witness placed a white Explorer at the scene of the November 23 shooting, with a different witness placing a white Explorer at the scene of the November 24 shooting. The State's ballistics expert also testified that the .40-caliber shell casings recovered from the scene of the November 24 shooting matched those recovered from the scene of the November 23 shooting, and Facebook posts showed that, days before the

11

shootings, Harris claimed to possess a particular brand of .40-caliber gun—a Springfield—that, according to the State's ballistics expert, could have fired the .40-caliber shell casings recovered at the scene of both shootings. Viewed as a whole, a reasonable juror could infer from the evidence presented at trial and recounted in part above that the same person or group of people were involved in both the November 23 and 24 shootings and that Harris participated in those crimes. And although the evidence against Harris was far from overwhelming, it did allow a reasonable jury to conclude beyond a reasonable doubt that Harris was at least a party to the crimes of which he was convicted, and that there was no "reasonable hypothesis," OCGA § 24-14-6, other than Harris's guilt. See *Frazier*, 308 Ga. at 453; OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime.").

3. Harris contends that the trial court erred by admitting evidence of the weapons and ammunition officers found at the time of Harris's arrest. We disagree.

12

At trial, Harris's counsel moved to exclude all testimony and evidence relating to a gun and ammunition found on or near Harris at the time of his arrest, arguing that it was irrelevant and unduly prejudicial to Harris. The trial court denied that motion, and the State admitted several photographs of the handgun and ammunition that were found with Harris at the time of his arrest, as well as the actual Taurus handgun and ammunition that officers recovered. Lieutenant Deaton testified that as he arrested Harris, Deaton recovered a bag with a "tremendous" amount of ammunition in it. Later, during her closing argument, the prosecutor noted that Harris was found with a ".45 caliber pistol with ammunition in the . . . chamber, and it [was] cocked."

In his motion for new trial, Harris argued that the trial court violated OCGA §§ 24-4-401 ("Rule 401") and 24-4-403 ("Rule 403") by allowing admission of testimony about Harris's arrest as well as photographs of physical evidence taken at the time of Harris's arrest, which was four months after the November 23 and 24 shootings. In the trial court's order denying Harris's motion for new

13

trial, the court reasoned that the "circumstances of Defendant's arrest, including evidence of the gun and ammunition, were relevant to Defendant's flight, his consciousness of guilt, and his willingness to hide and arm himself for the encounter with law enforcement."

On appeal, Harris again contends that this evidence was irrelevant under Rule 401 and unfairly prejudicial under Rule 403. The admission of evidence "lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion." *Flannigan v. State*, 305 Ga. 57, 62 (823 SE2d 743) (2019) (citation and punctuation omitted).

The trial court did not abuse its discretion by concluding that the evidence the State presented about the handgun and ammunition found with Harris at the time of his arrest was relevant under Rule 401. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. Because Georgia's Evidence Code based its relevance definition on Rule 401 of the Federal Rules of

14

Evidence, we "look to decisions of the federal appeals courts construing and applying the Federal Rules, especially the decisions of the Eleventh Circuit," *Gates v. State*, 298 Ga. 324, 327 (781 SE2d 772) (2016) (citations and punctuation omitted), and the Eleventh Circuit has explained that it is "universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *United States v. Borders*, 693 F2d 1318, 1324 (11th Cir. 1982) (citation and punctuation omitted). See also *Rowland v. State*, 306 Ga. 59, 65 n.4 (829 SE2d 81) (2019) ("Evidence showing that a defendant attempted to evade arrest . . . may be admissible as evidence of flight, and statements about flight are generally admissible as circumstantial evidence of guilt.").

Moreover, we cannot say that the introduction of this evidence was unduly prejudicial under Rule 403. "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the

15

jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403. "Rule 403 is an extraordinary remedy, which should be used only sparingly, and the balance should be struck in favor of admissibility." *Carston v. State*, 310 Ga. 797, 803 (3) (b) (854 SE2d 684) (2021) (citation and punctuation omitted). Therefore, "in reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." Id. (citation and punctuation omitted).

Here, the evidence related to Harris's attempt to evade arrest by barricading himself in a room—evidence that included the handgun and ammunition that was found near Harris at the time of his arrest—had probative value because it suggested that Harris had a reason to evade law enforcement officers and therefore demonstrated Harris's consciousness of guilt. And in a circumstantial case like this one, the need for this type of evidence was greater because it provided an additional set of facts from which the jury was authorized to infer Harris's guilt. See *Rowland*, 306

16

Ga. at 65 n.4.

Nor does the danger of unfair prejudice substantially outweigh the probative value of the evidence that was admitted. That is particularly true because the State did not argue that the gun and ammunition recovered during Harris's arrest were used in the November 23 or 24 shootings. And even though "inculpatory evidence is inherently prejudicial" in a criminal case, Rule 403 does not bar admission of such evidence merely because the defendant might suffer some amount of prejudice upon its introduction; it "is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion," *Anglin v. State*, 302 Ga. 333, 337 (806 SE2d 573) (2017) (citation and punctuation omitted; emphasis in original), and Harris has not shown that he suffered such prejudice. Accordingly, the trial court did not abuse its discretion when it admitted evidence of the handgun and ammunition that were found with Harris when he was arrested.

4. Harris contends that the trial court erred by admitting evidence of his Facebook posts. Prior to trial, Harris made a motion

17

to exclude "any picture of the defendant with a firearm," arguing that such photographs were irrelevant and prejudicial. Due to the "overly broad" language in the motion, the trial court declined to rule on the motion at that time and instead decided to evaluate the admissibility of any contested pictures on a "photo-by-photo" basis during trial.

To that end, during Marshall's direct examination, the State attempted to introduce a series of message exchanges on Facebook between Harris and Marshall, which included a photograph Harris sent of an "XD Springfield 40"—a gun Harris claimed to possess. The State argued that the picture and messages were relevant because they were sent on November 14, 2015, ten days before Bowden's murder, and the gun pictured in Harris's Facebook messages was one of the types of guns that the State's expert testified could have fired the .40-caliber rounds found after both the November 23 and 24 shootings. The trial court overruled Harris's objection, concluding that the photograph was relevant and that the evidence did not violate Rule 403.

The trial court did not abuse its discretion in concluding that the photograph and messages in question were relevant. That Harris claimed to possess a gun that could have been used in the November 23 and 24 shootings—namely, the "XD Springfield 40" that is one of only three brands the State's ballistics expert said could have fired the .40-caliber rounds recovered from the scene of both shootings—is a "fact that is of consequence to the determination of the action[,]" OCGA § 24-4-401, because it had a tendency to make it more probable that one of the weapons used in the shootings belonged to Harris.

Nor did the trial court abuse its discretion in concluding that the admission of the Facebook evidence did not violate Rule 403. Even to the extent the Facebook picture and messages were prejudicial to his defense, he has not shown that they were unfairly prejudicial. See *Anglin*, 302 Ga. at 337. And any prejudicial effect Harris suffered as a result of the admission of that evidence was outweighed by its probative value, especially given that it was used to show—in a circumstantial case in which no murder weapon was

19

found—that Harris had in his possession approximately one week prior to the shootings a type of gun that could have been used in those shootings. See *Johnson v. State*, 312 Ga. 481, 493 (863 SE2d 137) (2021) (holding that the trial court did not abuse its discretion in admitting evidence over a Rule 403 objection when it was not a "matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect") (citations and punctuation omitted).

5. Harris contends that his trial counsel provided ineffective assistance under the Sixth Amendment to the United States Constitution because she failed to call Dashauna Wilborn as a witness at trial. His claim fails, however, because he has not shown that his counsel's performance was deficient.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355,

20

356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466 U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

Harris contends that his trial counsel should have called Wilborn as a witness at trial because she saw Harris being attacked at the M&N Package Store and also observed the November 23 and 24 shootings. According to Harris, Wilborn would have testified that Pearson's white Explorer was not the same SUV used in the November 23 and 24 shootings.

21

At the hearing on Harris's motion for new trial, Wilborn

testified that she saw people shooting out of a "white Expedition"

during the November 23 shooting, that a "white Tahoe" was used

during the November 24 shooting, and that the white Expedition

used in the November 23 shooting was not the same white SUV that

she saw Harris leave in after he was attacked at the package store

days earlier.  In denying Harris's motion for new trial, the trial court

made specific findings about Wilborn's credibility, including:

> First, Ms. Wilborn never spoke with the police on the day or night of the shootings despite claiming to have had a clear view of those shootings and despite personally knowing the victims.
> Second, when she did speak with the police a few days after the murder, she gave them far less information than she testified to during the motion for new trial hearing five years later, and she in fact told the police she was unable to provide further information. . . .
>
> . . .
>
> Fifth, while Ms. Wilborn testified at the post-trial hearing that the vehicle involved in the November 21 assault was a Ford Explorer, she did not make such a statement to the police after the shooting.  Similarly, while she testified at the post-trial hearing that the vehicle involved in the November 24 murder was a Tahoe, there is no indication she told the police that when questioned after the shooting.  While she did apparently tell the police that the vehicle involved on November 23

22

was "different from that of today's date" (presumably November 24), she "was unable to provide any further details about what occurred." It seems likely that her memory and knowledge of the events she claims to have witnessed would have been far better when she spoke with the police days after the murder than it was at the time of the post-trial hearing, nearly five years after the murder. This casts doubt on her 2020 testimony.

The trial court ultimately concluded that

> [i]t is not at all clear that Ms. Wilborn's testimony (even if believed) would have likely led to a different outcome in this case or that it would have materially helped Defendant at all. Critically, other credible evidence supported the State's theory that a white SUV was involved in all three incidents and that the Defendant had access to and use of a white SUV during the relevant times. While Ms. Wilborn identified three different vehicle models, she nonetheless testified that a white SUV was involved in all three incidents. This testimony could have easily hurt, rather than helped, the defense.

We "ordinarily afford great deference to credibility determinations by trial courts, including in the motion-for-new-trial context," *Debelbot v. State*, 305 Ga. 534, 540 (826 SE2d 129) (2019), and we cannot say that the trial court's credibility findings were clearly erroneous here. See *Grimes v. State*, 296 Ga. 337, 346 (766 SE2d 72) (2014) ("In the absence of a showing of clear error, we do

23

not disturb the trial court's credibility determinations."). Especially given Wilborn's inconsistent testimony at the hearing on the motion for new trial as compared to her statements shortly after the shootings, "the failure of counsel to call [her] as a witness at trial was not deficient performance." *Huff v. State*, 299 Ga. 801, 806 (792 SE2d 368) (2016). See also *Washington v. State*, 294 Ga. 560, 566 (755 SE2d 160) (2014) ("It is settled that the determination of which defense witnesses to call . . . [is a] matter[ ] of trial strategy and tactics, and such strategic and tactical decisions do not amount to deficient performance unless they are so unreasonable that no competent attorney would have made them under similar circumstances.").[2]

---

[2] In support of his argument that his trial counsel provided constitutionally ineffective assistance, Harris points to *Cartwright v. Caldwell*, 305 Ga. 371 (825 SE2d 168) (2019), a habeas case in which this Court concluded that trial counsel performed deficiently when he failed to cross-examine a particular witness to "cast doubt on the credibility of the State and one of its key witnesses and to bolster Cartwright's alibi defense." Id. at 379. But *Cartwright* is distinguishable; among other reasons, we concluded in that case that there was "no indication . . . that [the uncalled witness] would not have been credible or would have refused to testify if called." Id. at 379. Here, by contrast, the trial court expressly found that the uncalled witness, Wilborn, lacked credibility when she testified about the very issue Harris contends was

And even though trial counsel testified at the motion-for-new-trial hearing that she "d[id] not know" why she did not call Wilborn as a witness at trial, an attorney's professed reason for making a decision at trial does not determine whether the attorney's performance was deficient under *Strickland*. Indeed, *Strickland* imposes an "objectively unreasonable" standard for analyzing deficiency, *Romer*, 293 Ga. at 344, and in light of the trial court's express findings about Wilborn's credibility, we cannot say that trial counsel was objectively unreasonable not to call Wilborn as a witness, see *Strickland*, 466 U.S. at 687-688.

*Judgment affirmed. All the Justices concur.*

---

so critical for his case. Unlike with the witness in *Cartwright*, we cannot say that it was objectively unreasonable for trial counsel not to call Wilborn as a witness in Harris's trial.

Decided February 15, 2022.

Murder. Muscogee Superior Court. Before Judge Land.

*Angela B. Dillon*, for appellant.

*Mark P. Jones, District Attorney, Frederick Lewis, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.